763 So.2d 829 (2000)
Melissa BRAUD
v.
FIRST NATIONAL BANK OF GONZALES.
No. 98 CA 2106.
Court of Appeal of Louisiana, First Circuit.
June 23, 2000.
Rehearing Denied August 22, 2000.
*831 Denise Vinet, Vinet & Vinet, Baton Rouge, Counsel for Plaintiff/Appellee Melissa Braud.
Sammie M. Henry, Baton Rouge, Counsel for Defendants/Appellants First National Bank of Gonzales and Louisiana Workers' Compensation Corporation.
Before: WHIPPLE, PARRO, KUHN and GUIDRY, JJ., and KLINE,[1] J. Pro Tem.
KUHN, J.
In this workers' compensation case, an employer appeals a ruling awarding temporary total disability benefits, supplemental earnings benefits (SEBs), and attorney's fees in favor of the claimant. For the following reasons, we affirm in part, reverse in part, vacate in part and remand.

I. FACTS AND PROCEDURAL HISTORY
Melissa Braud was a vice president and branch manager of the First National Bank of Gonzales ("First National") at its Galvez branch. Mrs. Braud had been employed by First National for approximately seventeen years, when on the morning of October 21, 1996, a robbery occurred at her branch in the presence of the following bank employees: Mrs. Braud, Janet Alexander, and Debbie Adams.[2] The robber entered the door of the bank with a gun and ordered the three employees to get down on the floor behind the counter where the tellers served customers. Next, he ordered Adams to the counter and demanded that she place money into his bag. After instructing the employees not to get up for five minutes, he fled from the bank. During the robbery, Adams had engaged the silent alarm and the police arrived shortly after the robber left the bank. The branch was closed for the remainder of the day and the branch employees were sent home.
The next day, Mrs. Braud returned to work and attended a counseling session conducted by Hidalgo Healthcare at the bank's request to address any problems the employees of the Galvez branch may have been having as a result of the robbery. For the next several days, Mrs. Braud performed her job duties. However, on November 1, 1996, ten days after the robbery, Mrs. Braud was taken home from work by First National's chief executive *832 officer, Kevin James Schexnayder, Sr., due to her mental state. Schexnayder stated that Mrs. Braud was crying, rambling, accusatory, and not in control of her senses. Mrs. Braud remained off of work from November 1, 1996, to December 1, 1996.[3] During this time, she sought the services of a therapist and was evaluated by a psychiatrist. After returning to work, Mrs. Braud continued her employment with First National while under medical treatment until she was terminated on February 7, 1997.
Mrs. Braud filed a disputed claim for workers' compensation seeking indemnity benefits, medical expenses, attorney's fees, and penalties alleging that the bank robbery had caused her to suffer chronic depression. After a hearing, the Office Of Workers' Compensation ("OWC") ruled in favor of Mrs. Braud and against First National and its insurer, Louisiana Workers' Compensation Corporation ("LWCC"). In a ruling dated February 12, 1998, the OWC decreed that Mrs. Braud sustained a work-related accident on October 21, 1996,[4] Mrs. Braud was entitled to recover temporary total disability benefits from the date of her termination, February 7, 1997, until she returned to work in May 1997, and she was entitled to SEBs from May 1997, until she was able to earn at least ninety percent of her average weekly wages. Additionally, the ruling ordered payment of all medical bills related to this accident and awarded Mrs. Braud $5,000.00 in attorney's fees. The ruling specifically provided that no penalties were assessed against First National.
First National and LWCC appeal, challenging the OWC's award of benefits and attorney's fees. Mrs. Braud filed an answer seeking additional attorney's fees for the efforts expended in defending this appeal.

II. STANDARD OF REVIEW
Factual findings in a workers' compensation case are subject to the manifest error or clearly wrong standard of appellate review. Banks v. Industrial Roofing & Sheet Metal Works, Inc., 96-2840, p. 7 (La.7/1/97), 696 So.2d 551, 556. The two-part test for the appellate review of a factual finding is: 1) whether there is a reasonable factual basis in the record for the finding of the trial court, and 2) whether the record further establishes that the finding is not manifestly erroneous. Mart v. Hill, 505 So.2d 1120, 1127 (La.1987). Thus, if there is no reasonable factual basis in the record for the trial court's finding, no additional inquiry is necessary. However, if a reasonable factual basis exists, an appellate court may set aside a trial court's factual finding only if, after reviewing the record in its entirety, it determines the trial court's finding was clearly wrong. See Stobart v. State, Through Dep't of Transp. and Dev., 617 So.2d 880, 882 (La.1993).

III. ANALYSIS
In order for a claimant to recover benefits under the workers' compensation statute, the claimant must prove that he has suffered a personal injury as a result of a work-related accident and that the injury has rendered him either temporarily totally disabled, permanently totally disabled, and/or permanently partially disabled or entitled to SEBs. La. R.S. 23:1021, 1221. Louisiana Revised Statute 23:1021(7)(b) addressing mental injury caused by mental stress provides, in pertinent part:
Mental injury or illness resulting from work-related stress shall not be considered a personal injury by accident arising out of and in the course of employment and is not compensable ... unless the mental injury was the result of a *833 sudden, unexpected, and extraordinary stress related to the employment and is demonstrated by clear and convincing evidence.
The "clear and convincing" standard is a heavier burden of proof than the usual civil case of "preponderance of the evidence" standard but is less burdensome than the "beyond a reasonable doubt" standard of a criminal prosecution. To prove a matter by clear and convincing evidence means to demonstrate that the existence of a disputed fact is highly probable; that is, much more probable than its nonexistence. Traweek v. City of West Monroe, 30,571, p. 6 (La.App.2d Cir.5/13/98), 713 So.2d 655, 660, writ denied, 98-1936 (La.11/6/98), 727 So.2d 449.

A. Temporary Total Disability Benefits
Appellants concede that the October 21, 1996, bank robbery was a "sudden, unexpected, and extraordinary stress" but contend the OWC was manifestly erroneous in finding that the robbery was the cause of Mrs. Braud's chronic depression. Appellants emphasize that the testimony of Mrs. Braud, several of the bank employees and Mrs. Braud's treating psychiatrist, Dr. Elodie Braud, establish that Mrs. Braud's chronic depression was not caused by the bank robbery. Appellants urge that the medical evidence establishes Mrs. Braud was suffering from this mental condition prior to the robbery and that Mrs. Braud failed to establish by clear and convincing evidence that the robbery caused this condition.
Two years prior to the bank robbery, Danny Sample, who was First National's president at that time, resigned. There were rumors of embezzlement associated with his resignation. After Sample's resignation, Mrs. Braud learned from another bank employee that other bank officers were being paid more money than Mrs. Braud was being paid. As a result, Mrs. Braud became distrustful of the other officers at the bank. On several occasions, Mrs. Braud became upset and experienced crying spells while at work. Mrs. Braud also experienced feelings of paranoia and confusion regarding her co-workers. In discussions with some of the bank employees, Mrs. Braud related that she thought the medication from a weight loss study in which she was participating was the cause of her emotional problems. Mrs. Braud stopped taking these medications, and was able to continue performing her job duties. In September 1996, one month prior to the robbery, Mrs. Braud sought the medical attention of Dr. Thomas Perkins, who prescribed an antidepressant for her anxiety and stress.
After the robbery, Mrs. Braud displayed renewed signs of paranoia and depression. She had crying spells and confrontations with her co-workers. On November 1, 1996, she began to cry and exhibit very erratic behavior. Mrs. Braud accused Schexnayder and Grady Melancon, the current bank president, of staging the robbery to make her crazy. Schexnayder testified that he had never seen Mrs. Braud behave so irrationally. He took her home and recommended that she get help.
After being driven home on November 1, 1996, Mrs. Braud saw Jay Martinez, a social worker, for therapy. At this time, Dr. Perkins was still managing her medication. Mrs. Braud reported to Martinez that she was very upset as a result of the robbery; she felt she had been robbed of her security. Mrs. Braud also reported that the robbery had exacerbated her dissatisfactions regarding interpersonal matters at the banks. Martinez noted she was confused, very paranoid, very depressed and very anxious and that she was not sleeping well. Martinez also noted a connection between the trauma and the accumulated stress related with her work. Mrs. Braud continued to attend the counseling sessions with Martinez during the month of November and appeared to be improving. Mrs. Braud returned to work at the bank on December 1, 1996. Mrs. Braud testified that she was still having *834 problems when she returned to work. During a December 6, 1996 counseling session, Martinez noted that Mrs. Braud became emotional when describing work stress. At this time, he recommended that Dr. Elodie Pons Braud, a psychiatrist, evaluate her.
Dr. Braud evaluated Mrs. Braud on December 9, 1996, and diagnosed a major depressive episode that was partially resolved, dysthymia, and a personality disorder. Dr. Braud testified that Mrs. Braud was mildly anxious and depressed during the evaluation. Dr. Braud determined that Mrs. Braud suffered from dysthymia, a low-grade chronic depression that waxes and wanes over time, which stemmed back to earlier experiences in her life. Dr. Braud opined that upon Mr. Sample's resignation from the bank, Mrs. Braud felt betrayed and suspected other employees were involved. At this point, she began to experience paranoia and emotional problems. Dr. Braud stated the robbery caused Mrs. Braud's depression and paranoia to worsen, resulting in a major depression. Dr. Braud explained that if the robbery had not occurred, Dr. Perkins, her primary care doctor, could have managed Mrs. Braud's symptoms, and it would never have been necessary for Dr. Braud to become involved. Mrs. Braud had not seen a psychiatrist or psychologist for depression before the robbery.
During January of 1997, Dr. Braud noted that Mrs. Braud's paranoia continued on the job but that she was "well controlled on current medication." However, on February 7, 1997, Mrs. Braud was terminated. The bank's personnel officer, Mona Bourgeois, testified that Mrs. Braud was terminated because of continuing problems with her job performance. Although she stated that Mrs. Braud had been an accurate and diligent worker in previous years, at the time she was terminated, she was not performing according to the standards expected of someone holding the position of officer, manager and supervisor. Schexnayder testified that although Mrs. Braud's termination had been discussed prior to the robbery, the bank had never threatened Mrs. Braud with termination or placed her on probation.
Dr. Braud continued to treat Mrs. Braud on a regular basis after the termination and was still treating her as of the time of the OWC hearing. Dr. Braud testified that Mrs. Braud regressed after she was fired. Dr. Braud prescribed an anti-psychotic medication as a result of Mrs. Braud's increased paranoia. As of March 10, 1997, Dr. Braud diagnosed major depressive episode with paranoid psychotic features. As of April 7, 1997, Mrs. Braud's condition was beginning to improve, but she continued to exhibit a "constricted affect." Her mood was "anxious and mildly depressed," despite continued medication. As of May 5, 1997, she continued to be somewhat regressed, her affect was constricted and her mood was mildly anxious and depressed. During a May 26, 1997 office visit, Mrs. Braud reported that she had a new job as a teller at a credit union. Dr. Braud testified that after Mrs. Braud was fired, she was not employable until she attained this new job.
During the OWC hearing, Mrs. Braud testified she had experienced some crying spells at work prior to the bank robbery. She explained that she took it hard when Mr. Sample resigned and she learned it involved allegations of embezzlement. According to Mrs. Braud, after the robbery took place, she "lost control," "started falling apart" and became "psychotic." She explained that although she had experienced some paranoia before the robbery, her paranoia and distrust intensified after the robbery. Mrs. Braud stated that after the robbery, she experienced a change in her personality, which she did not attribute to the robbery until she went through counseling.
Although Mrs. Braud testified that her condition deteriorated after the robbery, Mona Bourgeois testified that she had received complaints from other bank employees *835 regarding Mrs. Braud's hostility, aggression, rudeness and emotional behavior before the robbery. Bourgeois testified she noticed no difference in either Mrs. Braud's work performance or emotional state from before the robbery to after the robbery.
Schexnayder testified that he thought Mrs. Braud was having problems prior to the robbery. He acknowledged that on the day he brought Mrs. Braud home, ten days after the robbery, she was in "bad shape." He assessed her mental condition to be serious and believed she needed medical help. Although Schexnayder testified that Mrs. Braud had been experiencing emotional problems since he started working for the bank in 1994, he believed that the problems Mrs. Braud was experiencing were attributable in part to the robbery.
Amy Bianca, another teller who worked with Mrs. Braud, testified that Mrs. Braud was upset and crying on a regular basis prior to the robbery. She testified that although Mrs. Braud was shaken up on the day of the robbery, she saw no change in Mrs. Braud's behavior after the robbery. She explained that Mrs. Braud continued to have crying spells.
Georgia Henry, one of the tellers who worked with Mrs. Braud, testified she had witnessed Mrs. Braud's regular crying spells prior to the robbery. She stated that Mrs. Braud had managed to carry out her job duties despite her emotional problems. Henry was transferred to another branch of the bank after the robbery, so she was not able to testify regarding Mrs. Braud's behavior after the robbery.
Debra Adams, one of the tellers present at the time of the robbery, testified she had witnessed Mrs. Braud's frequent crying spells and inappropriate behavior that interfered with her work prior to the robbery. Adams was transferred to another department two days after the robbery and did not witness Mrs. Braud's behavior after the robbery.
Janet Alexander, one of the bank employees present at the time of the robbery, testified that Mrs. Braud became upset easily when customers would inquire about the robbery. She had only worked with Mrs. Braud for about two months before the robbery and did not comment on Mrs. Braud's behavior before the robbery.
The OWC determined that Mrs. Braud had suffered a mental injury as a result of the October 21, 1996 robbery, and that this injury had rendered Mrs. Braud temporarily totally disabled from the date on which Mrs. Braud was terminated, February 7, 1997, until the date she returned to work during May of 1997.[5] Considering the medical and lay evidence, we cannot say that the OWC was manifestly erroneous in finding that Mrs. Braud established by clear and convincing proof that she suffered a mental injury that caused her to be temporarily totally disabled during the three-month period in question. The evidence establishes this finding is highly probable. While we agree with appellants' contention that Dr. Braud's testimony establishes that Mrs. Braud's chronic depression was not caused by the bank robbery, we find Dr. Braud's testimony strongly supports the OWC's conclusion that Mrs. Braud's low-grade chronic depression was aggravated by the robbery, which caused a major depression resulting in her temporary total disability during this time period. This conclusion is also supported by the claimant's testimony. While the testimony of some of the bank employees would have supported a different conclusion, the OWC apparently placed greater weight on Dr. Braud's medical testimony and the testimony of the claimant rather than on the testimony of the bank employees.
*836 An employee is entitled to workers' compensation benefits for the aggravation of a preexisting mental disorder for as long as the aggravation continues. If the employee recovers to his former condition, he is no longer entitled to compensation. Fuselier v. International Maintenance Corp., 94-792, p. 9 (La.App. 3d Cir.2/1/95), 649 So.2d 1197, 1202. The evidence supports the OWC's implicit finding that Mrs. Braud's preexisting depression was aggravated by the robbery causing a major depression which resulted in her temporary total disability from February 7, 1997, until May of 1997. We find no manifest error in this finding.

B. Supplemental Earnings Benefits
Under the provisions of La. R.S. 23:1221(3)(a), an employee is entitled to receive SEBs if he sustains a work-related injury that results in his inability to earn ninety percent or more of his average preinjury wage. The employee bears the burden of proof by a preponderance of the evidence that the injury resulted in his inability to earn that amount under the facts and circumstances of the individual case. Once the employee's burden is met, the burden shifts to the employer who, in order to defeat the employee's claim for SEBs or establish the employee's earning capacity, must prove by a preponderance of the evidence that the employee is able to perform a certain job and that the job was offered to the employee or that the job was available to the employee in his community or reasonable geographic location. Oubre v. Jacobs Engineering Group, 98-1129, p. 2 (La.App. 1 Cir. 5/14/99), 739 So.2d 235, 237, writs denied, 99-1515, 99-2317 (La.9/17/99), 747 So.2d 569 and 1108.
Appellants contend there is insufficient evidence to establish that Mrs. Braud is unable to earn ninety percent or more of her pre-robbery wage due to a disability. Appellee submits an employee who is able to earn but not earning ninety percent or more of his former wages is not entitled to SEBs.
We agree that in order to recover SEBs in this case, claimant is required to prove that she is actually unable to earn ninety percent of her pre-injury wages as a result of the major depression that resulted from the robbery. At the time of the hearing, Mrs. Braud was working as a teller and earning an hourly wage of $7.36, with a $100.00 per month stipend. Before the robbery, she was earning $11.79 an hour, plus bonuses, in her position as vice-president and branch manager. Thus, Mrs. Braud established she was actually earning less than ninety percent of her pre-injury wage. When questioned regarding her plans to return to a management position, Mrs. Braud testified that she was not able to return to a management position at that time. She stated that she felt like she was starting all over again. She explained that from a mental standpoint, she was incapable of being responsible for others and was only capable of being responsible for herself. She also testified that her doctors had instructed her to "stay out of management." While Dr. Braud testified that Mrs. Braud was employable as of May of 1997, Dr. Braud did not address whether Mrs. Braud's major depressive episode following the robbery had resulted in her inability to return to a management position at that time. We find Mrs. Braud's testimony alone is insufficient to establish that her inability to return to a management position resulted from her major depression that followed the robbery as opposed to her chronic low-grade depression that existed before the robbery.
Accordingly, we conclude the evidence in the record was insufficient to support the OWC's determination that Mrs. Braud was entitled to recover SEBs. Thus, the OWC's award of SEBs is vacated. However, because claimant has established that she is actually earning less than ninety percent of her pre-injury wages, we find the interests of justice require that this matter be remanded to the OWC. We remand to allow the presentation of evidence regarding *837 whether Mrs. Braud is able to earn ninety percent of her pre-injury wages as a result of the major depressive episode which followed the robbery. Based on that evidence, the OWC is directed to make a determination regarding claimant's entitlement to recover SEBs.

C. Attorney's Fees
The OWC awarded $5,000.00 in attorney's fees but awarded no penalties for appellants' failure to pay compensation benefits. Appellants assert that claimant is not entitled to an award of either penalties or attorney's fees because a rational basis existed for its refusal to pay workers' compensation benefits. Appellants argue they reasonably controverted the claim based on Mrs. Braud's history of abnormal behavior; they assert the evidence establishes her behavior was no worse after the robbery than before the robbery. They contend their argument is buttressed by the fact that no penalties were awarded by the OWC.
Louisiana Revised Statute 23:1201 provides, in pertinent part:
(F) Failure to provide payment ... shall result in the assessment of a penalty in an amount equal to twelve percent of any unpaid compensation or medical benefits or fifty dollars per calendar day, whichever is greater, for each day in which any and all compensation or medical benefits remain unpaid, together with reasonable attorney fees for each disputed claim ....
* * * * * *
(2) This Subsection shall not apply if the claim is reasonably controverted or if such nonpayment results from conditions over which the employer or insurer had no control.
The test of whether the employee's right has been reasonably controverted depends primarily upon whether the employer or insurer had sufficient factual and medical information to reasonably counter the factual and medical information presented by the claimant. McClendon v. Keith Hutchinson Logging, 96-2373, p. 10 (La.App. 1 Cir. 11/7/97), 702 So.2d 1164, 1171, writ denied, 97-2872 (La.2/13/98), 706 So.2d 995. A determination of whether a defendant should be cast with penalties and attorney's fees is essentially a question of fact, subject to manifest error review. 96-2373, p. 11, 702 So.2d at 1172.
The lay testimony of several of the bank employees established Mrs. Braud's history of emotionally erratic behavior prior to the robbery and that Mrs. Braud's behavior was essentially the same after the robbery. Dr. Braud's medical testimony established that Mrs. Braud suffered from chronic depression before and after the robbery.[6] Considering all of the evidence, we find that if the OWC concluded that the claim was not reasonably controverted, such finding was manifestly erroneous. The award of attorney's fees is not supported by the record or otherwise supported by law; accordingly, we reverse the $5,000.00 award in favor of claimant.
In an answer to defendants' appeal, claimant seeks an award of additional attorney's fees for preparation of her appellate brief. Generally, an increase in attorney's fees is awarded when a party who was awarded attorney's fees in the proceedings below is forced to and successfully defends an appeal. Bergeron v. Watkins, 98-0717, p. 10 (La.App. 1st Cir.3/2/99); 731 So.2d 399, 405. However, in the present case, since we reverse the award of attorney's fees by the OWC, we find no basis for awarding attorney's fees for the work associated with this appeal. Claimant's attorney has not been entirely successfully in defending the OWC's ruling in claimant's favor.

*838 IV. CONCLUSION
For these reasons, the portion of the OWC ruling awarding temporary total disability benefits and medical expenses to claimant is affirmed. The portion of the ruling awarding $5,000.00 in attorney's fees in Mrs. Braud's favor is reversed. The portion of the ruling awarding SEBs is vacated, and the matter is remanded to the OWC for a determination regarding claimant's entitlement to SEBs. One-half of the appeal costs is to be paid by appellants, First National Bank of Gonzales and LWCC, and the other one-half is to be paid by claimant-appellee, Mrs. Braud.
AFFIRMED IN PART, REVERSED IN PART, VACATED IN PART AND REMANDED.
GUIDRY, J., concurs in the result.
KLINE, J. Pro Tem., concurs in part and dissents in part with reasons.
PARRO, J., dissents in part and assigns reasons.
KLINE, J. Pro Tem., Concurring in Part and Dissenting in Part.
I concur in the majority's finding that Melissa Braud is entitled to workers' compensation benefits for the aggravation of her pre-existing depression caused by the robbery resulting in her temporary total disability from February 7, 1997, until May, 1997. I also concur in the majority's finding that the award of attorney's fees is not supported by the record or otherwise supported by law.
However, I dissent from the majority's remand of this matter back to the Office of Workers' Compensation to allow Melissa Braud to present evidence regarding her entitlement to Supplemental Earnings Benefits. In my opinion, there was insufficient evidence on this issue and under the totality of the circumstances, I would not allow this matter to be remanded.
PARRO, J., dissenting in part.
I agree with that portion of the majority opinion that affirms the workers' compensation judge's finding that Melissa Braud's preexisting depression was aggravated by the robbery causing a major depression which rendered her temporarily totally disabled. However, based on the facts presented, I disagree that such disability extended past December 1, 1996. Accordingly, I would not affirm the workers' compensation judge's award of temporary total disability benefits (TTD) for the period of February 1, 1997 through her return to work in May 1997. For the following reasons, I believe that Ms. Braud failed in her burden of proof with respect to her claim for TTD.
Although Ms. Braud testified that she was still having problems when she returned to work in December, she admitted she thought that she was doing well in her regular position. She was not aware of any problems. Furthermore, Dr. Elodie Pons Braud's and Jay Martinez's notes of January 6, 1997, reflect that Ms. Braud reported that she was much improved. She appeared to be coping well. Dr. Braud noted that her paranoia in the job was not as great as it was in the early fall of 1996. Nonetheless, on that day, Ms. Braud voiced that she suspected various irregularities, which she did not want to get involved with.
On February 7, 1997, Ms. Braud was terminated from her employment with the bank. In discussions with Mr. Martinez that day, Ms. Braud reported she felt that she had been fired because she would not ignore various illegal dealings and improper procedures at the bank. At the time of her firing, Ms. Braud was reportedly planning to go to the board of directors for the bank to report these dealings. As a result of the firing, Ms. Braud was fearful, hurt, upset, and depressed. Mr. Martinez's notes from Ms. Braud's February 7, 1997 therapy session reflect the following recollection of events leading up to her termination as follows:

*839 The patient recalls the current events to her problems at the bank. She states again that she feels like they are doing procedures and reports wrong. The patient states that they do not follow policy and procedure. The patient states that she has made numerous attempts to communicate these problems to upper management. She states that she has not been greeted with any acceptance when she reports these matters. The patient is concerned that she may have been fired due to some of her questions, concerns, and reports that she did in order to do her job correctly (from her perception). The patient readily admits that her depression and paranoid episodes have been as much a part of her personal way of coping with her issues, as well as the aggravation provided by conflicts at the bank. Among these conflicts would be most notably serious personality conflict with a person only named as Mona. The patient also significantly was involved, was working at the bank at a time when they were robbed by an armed bandit in approximately late October of 1996. The patient states that she feels exceptionally betrayed because her management team informed her that everything was going well, and that she was doing okay up to the time she was terminated.
The bank's personnel officer, Mona Bourgeois, testified that Ms. Braud was terminated because of continuing problems with her job performance, which the officer considered to be below standard.
According to Dr. Braud, between the time of the robbery and her firing, Ms. Braud was coping. However, Dr. Braud testified that Ms. Braud was devastated and totally distraught by the loss of her job. In Dr. Braud's opinion, her condition regressed and deteriorated after she was fired. Ms. Braud felt that she had been treated very unfairly. She was prescribed an anti-psychotic medication because of the degree of her paranoia. Although Dr. Braud recommended that Ms. Braud return to work at the end of February, she opined that Ms. Braud was unable to make a good enough presentation to get a job at that point. Dr. Braud attributed her level of functioning to the termination. She was very humiliated and hurt as a result of being fired. As an employee of 17 years, Ms. Braud considered her co-workers to be family and felt rejected by them when she was fired.
In seeking benefits for her mental condition, Ms. Braud contends the robbery caused her prior condition to intensify because it brought back all of the distrust she had experienced in her job previously. Medical evidence in the records lends support to this contention. Therefore, it appears that this alleged aggravation of her pre-existing injury may have entitled Ms. Braud to benefits for the duration of her disability associated with the robbery.[1] However, the record suggests that any such disability period would have ceased on December 1, 1996, when Ms. Braud returned to her job. The medical records reflect that from the time of the robbery to her return to work her condition improved dramatically. In light of her improved mental state, Ms. Braud returned to her job where she continued performing her regular duties for two months.
In deciding whether an employee in a worker's compensation action has proven her claimed disability, the totality of the evidence, medical and lay, must be considered. City of Baton Rouge v. Noble, 535 So.2d 467, 472 (La.App. 1st Cir.1988), writ denied, 539 So.2d 632 (La.1989). Furthermore, because of the possibility of symptoms being feigned in cases concerning mental injuries, courts should exercise extreme care in determining whether an employee proved he or she suffered such an injury, and whether the injury is causally *840 related to the accident. Williams v. Capitol Steel, 93-2154 (La.App. 1st Cir.10/7/94), 644 So.2d 705, 707.
The workers' compensation judge apparently found that Ms. Braud proved that her post-February 7, 1997 mental condition was the result of the October 21, 1996 robbery, which constituted a sudden, unexpected, and extraordinary stress related to her employment. However, after a thorough review and evaluation of the record, I feel that Ms. Braud failed to prove by clear and convincing evidence, as required by LSA-R.S. 23:1021(7)(b), which is set forth in the majority opinion, that her post-February 7, 1997 mental condition was causally related to the October 21, 1996 robbery. To the contrary, the evidence is not clear and convincing that Ms. Braud's problems stem from the robbery, but the record provides reasonable support for a finding that such condition was caused by her termination, which Ms. Braud has not shown was a sudden, unexpected, and extraordinary stress related to her employment. Therefore, in the absence of clear and convincing proof by Ms. Braud, I believe the workers' compensation judge manifestly erred in finding that Ms. Braud had a mental injury that was compensable under the workers' compensation laws.
For these reasons, I would also reverse and vacate that portion of the workers' compensation judge's judgment which awarded Ms. Braud temporary total disability benefits. Accordingly, I respectfully dissent in part.
NOTES
[1] Hon. William F. Kline, Jr., retired, is serving as judge pro tempore by special appointment by the Louisiana Supreme Court.
[2] Amy Bianca, a bank employee who was also working that day, was on break away from the bank at the time of the robbery.
[3] First National classified Braud's time off of work as family/medical leave. Braud received full pay during this time period.
[4] In oral reasons, the hearing officer stated that the "armed robbery incident of October 21st, 1996, constitutes a work-related accident."
[5] The record establishes Braud returned to work between May 5, 1997 and May 26, 1997, but does not establish the exact date on which Braud began to work. The parties apparently do not dispute this date.
[6] We also note that claimant's disputed claim forth set forth a claim for chronic depression resulting from the robbery as opposed to a claim for aggravation of her chronic depression.
[1] However, as noted in the majority opinion, Ms. Braud received full pay during this time period under family/medical leave.