836 So.2d 397 (2002)
Oliver BETHLEY
v.
KELLER CONSTRUCTION, MAPP Construction, Inc. and St. Paul Fire & Marine Insurance Company.
No. 2001 CA 1085.
Court of Appeal of Louisiana, First Circuit.
December 20, 2002.
*399 Lexlee Overton, Baton Rouge, for Plaintiff-Appellant Elizzle Bethley, et al.
R. Gray Sexton, Baton Rouge, for Defendants-Appellees MAPP Construction, Inc. and St. Paul Fire & Marine Ins. Co.
Before: CARTER, C.J., PARRO and CLAIBORNE,[1] JJ.
PARRO, J.
The claimant spouse appeals from a judgment awarding workers' compensation benefits for her husband's leg injury, based on an average weekly wage of $295, until his death by suicide, but denying her claims for death benefits.[2] For the following reasons, the judgment of the workers' compensation judge is affirmed.

Facts and Procedural History
Oliver Bethley (Bethley) sustained a crushing injury to his right foot and ankle and laceration to his right leg on December 18, 1998, when he was run over by a hydraulic excavator/backhoe during the course and scope of his part-time employment as a cement finisher for Keller's Concrete (Keller's).[3] As a result of his injuries, Bethley underwent multiple surgical procedures. On the day Bethley sustained physical injury to his right leg, foot, and ankle, Keller's was performing work for MAPP Construction, Inc. (MAPP) pursuant *400 to a subcontract agreement. Since Keller's did not have workers' compensation insurance coverage at the time of the accident, Bethley sought benefits from MAPP, his statutory employer, and its workers' compensation insurer, St. Paul Fire and Marine Insurance Company, via a disputed claim filed with the Office of Workers' Compensation Administration on February 25, 1999. Pursuant to this filing, a mediation hearing was seemingly scheduled for March 18, 1999. In the early morning hours of March 17, Bethley committed suicide by using a belt to hang himself from a tree in his back yard.
Subsequently, Elizzle Bethley, Bethley's surviving spouse, filed a motion for leave to file an amended disputed claim and to substitute her as the proper party claimant, individually and as natural tutrix of her two minor children. In her amended disputed claim, Ms. Bethley alleged that Bethley's death resulted from the injuries sustained on December 18, 1998. Accordingly, she asserted a claim for death benefits. In its answer, MAPP denied that Bethley's death was in any way related to his work accident.
In an effort to prove that Bethley's suicide was causally related to the physical injuries sustained on December 18, 1998, Ms. Bethley sought to have Dr. Robert Davis, a clinical psychologist, testify concerning a "psychological autopsy" he had prepared prior to trial. MAPP objected to the admissibility of such testimony on the grounds that it did not fall within the prescribed parameters of Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). After taking MAPP's objection under advisement, the workers' compensation judge (judge) excluded the testimony of Dr. Davis. Subsequently, judgment was entered decreeing, in pertinent part, that Bethley's average weekly wage was $295, that Ms. Bethley had failed to prove by clear and convincing evidence that Bethley's death was causally related to the December 18, 1998 accident, and that Ms. Bethley and her children were not entitled to death benefits. Ms. Bethley appealed contending that the judge erred in his calculation of Bethley's average weekly wage, in excluding Dr. Davis's testimony, and in failing to award death benefits.

Average Weekly Wages
Bethley's disputed claim form alleged an average weekly wage of $750. In its pre-trial statement, MAPP took the position that Bethley's average weekly wage was $270, and had voluntarily paid weekly indemnity benefits on the basis of this figure. Relying on LSA-R.S. 23:1021(10)(d), MAPP then submitted that Bethley's average weekly wage was $56.53 and filed a reconventional demand, seeking a credit or reimbursement for overpayment of indemnity benefits.
The wage information of record reveals that Bethley worked on a part-time basis for Keller's a total of 9 days during the twenty-six week period immediately preceding December 18, 1998, at a rate of $120 to $150 per day.[4] His rate of daily pay varied depending on the square footage involved and whether Keller's was forming, pouring, or finishing concrete. Weekly time sheets disclose that Bethley earned a total of $1,220 from August 3, 1998, through December 17, 1998.
When a claimant earns wages other than on an hourly, monthly, or annual basis, LSA-R.S. 23:1021(10)(d) directs that *401 the average weekly wage shall be determined as follows:
If the employee is employed on a unit, piecework, commission, or other basis, his gross earnings from the employer for the twenty-six week period immediately preceding the accident divided by the number of days the employee actually worked for the employer during said twenty-six week period and multiplied by the average number of days worked per week; however, if such an employee has worked for the employer for less than a twenty-six week period immediately preceding the accident, his gross earnings from the employer for the period immediately preceding the accident divided by the number of days the employee actually worked for the employer during said period and multiplied by the average number of days worked per week.
In her brief filed with this court, Ms. Bethley admits that Bethley had been working for Keller's on a periodic basis during the previous six months when he was injured on the job. Nonetheless, Ms. Bethley submits that Bethley worked for Keller's for less than a 26-week period and suggests that his average weekly wage was $335, as opposed to $295 calculated by the judge. In arriving at this figure, Ms. Bethley utilized Bethley's earnings for the four weeks that he worked for Keller's during the months of August and December of 1998, inclusive of the date of his accident.[5]
Although it is unclear how the judge determined that Bethley's average weekly wage was $295, he apparently found that Bethley had worked for Keller's during the 26-week period immediately prior to his accident, that his gross earnings from Keller's for that 26-week period was at least $1,340, and that he had actually worked a total of 10 days during that time span. These findings are reasonably supported by the record and are not manifestly erroneous. Although the methodology used in determining the average number of days worked per week was not disclosed by the judge, we are satisfied that the record in this case would not support a finding of Bethley's average weekly wage that would be greater than the amount calculated by the judge.[6] Thus, Ms. Bethley's contention that Bethley's average weekly wage was $335 lacks merit.

Admissibility of Dr. Davis's Testimony
In an effort to prove that Bethley's suicide was causally related to the injuries sustained on December 18, 1998, Ms. Bethley sought to have Dr. Robert Davis, a clinical psychologist, testify concerning a "psychological autopsy" he had prepared concerning Bethley. Dr. Davis testified that he had previously qualified as an expert in clinical psychology. Although he had previously been requested to perform a psychological autopsy in connection with a claim for life insurance and the death of an inmate, he had not until now been requested to perform one in connection with a workers' compensation matter.
Dr. Davis explained that a psychological autopsy is an attempt in retrospect to discern the state of mind of the decedent at the time of his death. He stated that it *402 requires some understanding of the nature of the decedent's life prior to and leading up to the time of the death. This understanding is obtained by interviewing individuals and reviewing records in order to render an opinion as to the reason the decedent committed suicide.
When Ms. Bethley sought to have Dr. Davis testify concerning the cause of Bethley's suicide, MAPP moved to have the testimony of Dr. Davis ruled inadmissible under LSA-C.E. art. 702 on the basis that his testimony did not meet the standard of admissibility set forth in Daubert, 113 S.Ct. 2786.
When faced with a proffer of expert scientific testimony, the judge must determine at the outset whether the expert is proposing to testify to scientific knowledge that will assist the trier of fact to understand or determine a fact in issue. This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue. Independent Fire Insurance Company v. Sunbeam Corporation, 99-2181 (La.2/29/00), 755 So.2d 226, 234; Daubert, 113 S.Ct. at 2796; see LSA-C.E. art. 702. In fulfilling this gatekeeping role, the trial judge must ensure that the proffered evidence is not only relevant, but reliable, by utilizing a flexible approach requiring that consideration be given to factors such as whether the technique can be (and has been) tested, whether it has been subjected to peer review and publication, whether there is a known or potential rate of error, and whether the relevant scientific/expert community generally accepts the technique. Daubert, 113 S.Ct. at 2796-2797;[7]Kumho Tire Company, Ltd. v. Carmichael, 526 U.S. 137, 149-150, 119 S.Ct. 1167, 1175, 143 L.Ed.2d 238 (1999). Each of these factors may or may not be relevant to the particular inquiry. Kumho, 119 S.Ct. at 1175.
After considering the evidence presented in support of and in opposition to MAPP's motion to exclude the testimony of Dr. Davis, the judge found that the psychological autopsy has been subjected to peer review and publication. Furthermore, it was found to be generally accepted in the scientific community with evidence of what the potential rate of error is in conducting these autopsies. However, he observed that the ability to test the expert's theory or technique is problematic, in that the subject of the theory or technique is deceased. Nonetheless, the judge noted that the technique might still pass the Daubert test, depending on the level of reliability of Dr. Davis's testimony.
Relative to the level of reliability of the expert testimony sought to be introduced, the judge observed that a psychological autopsy is relatively reliable to show whether a person had a mental or substance abuse disorder or whether an incident was a suicide or a homicide. However, the judge questioned the reliability of a psychological autopsy to prove that a suicide was caused by a specific work-related accident. He remarked that the psychological autopsy is unreliable in revealing the cause of a mental disorder and why a person decided to take his or her own life at a given point in time, which was the issue Ms. Bethley sought to use Dr. Davis's testimony to prove. Accordingly, the judge concluded that the Daubert/Kumho requirements for admissibility of an expert's opinion were not satisfied in this case.
*403 A trial judge has broad discretion in determining whether Daubert's specific factors are reasonable measures of reliability in a particular case. Ultimately, the trial judge's decision to admit or exclude expert testimony is subject to the abuse of discretion standard of review. Kumho, 119 S.Ct. at 1176. After considering the evidence presented to the judge concerning MAPP's motion to exclude the testimony of Dr. Davis, we are not convinced that the judge abused his discretion in ruling on the admissibility of such testimony under the facts of this case. We recognize that there are cases in this state that have been resolved after consideration was given to expert testimony concerning a psychological autopsy; however, the psychological autopsies in those cases were used to prove something other than the reason the decedent committed suicide, for example, whether there was undue influence over the testator by a legatee in the making of a will or whether a death was a homicide or a suicide for purposes of determining coverage under a life insurance policy. See Succession of Reeves, 97-20 (La.App. 3rd Cir.10/29/97), 704 So.2d 252, writ granted, 98-0581 (La.5/1/98), 805 So.2d 185;[8]Brown v. Hartford Life Companies, 593 So.2d 1376 (La.App. 5th Cir. 1992).
Furthermore, Dr. Davis had never met or interviewed Bethley. His conclusion was based largely on (1) conversations with Ms. Bethley, who has a financial interest in this case, (2) his review of medical records pertaining to Bethley's physical injury that make no mention of complaints of pain by Bethley after January 26, 1999, and (3) his reading of deposition testimony. We recognize that Ms. Bethley introduced literature to show that psychological autopsies may be helpful in determining causation. However, we note that there is conflicting literature in the record focusing on the unreliability of such a procedure, in that generally much of the information forming the basis of the psychological autopsy, as in this case, is obtained from significant others of the deceased. This fact casts doubt on the validity of the psychological autopsy because of the possibility that important data may be intentionally concealed and thus unavailable to the clinical psychologist for consideration in the preparation of the psychological autopsy. Accordingly, we find no abuse of discretion by the judge relative to the exclusion of Dr. Davis's testimony under the facts of this case.

Entitlement to Death Benefits
Dependents of an injured employee are entitled to receive benefits for any injury that arises in the course and scope of employment that results in the death of the employee. Quinones v. United States Fidelity and Guaranty Company, 93-1648 (La.1/14/94), 630 So.2d 1303, 1306; see LSA-R.S. 23:1031 and 1231. Ms. Bethley contends that the December 18, 1998 accident caused a mental injury resulting in Bethley's March 17, 1999 death. Thus, Ms. Bethley submits that Bethley's dependents are entitled to death benefits as a result of the personal injury sustained on December 18, 1998.
A mental injury or illness caused by a physical injury to the employee's body shall not be considered a personal injury by accident arising out of and in the course of employment and is not compensable under the workers' compensation law unless it is demonstrated by clear and convincing evidence. LSA-R.S. *404 23:1021(7)(c); see LSA-R.S. 23:1021(7)(d). Under LSA-R.S. 23:1021(7)(c), a claimant must prove not only a mental injury, but also a causal link between the physical injury and the mental injury. Smith v. Schwegmann Giant Supermarkets, 94-367 (La.App. 5th Cir.11/16/94), 646 So.2d 1098, 1101, writ denied, 94-3071 (La.2/9/95), 649 So.2d 423. The mental injury must be proven just as any other disabling injury. Bernard v. O'Leary Brothers Signs, Inc., 606 So.2d 1331, 1337 (La.App. 3rd Cir. 1992). The level of proof required to establish temporary total disability and permanent total disability, as well as the causal relationship between the mental injury and the physical injury, is by clear and convincing evidence. See LSA-R.S. 23:1221(1)(c) and (2)(c); LSA-R.S. 23:1021(7)(c); see also Charles v. South Central Industries, 96-0883 (La.11/25/96), 683 So.2d 706, 709. To prove a matter by clear and convincing evidence means to demonstrate that the existence of a disputed fact is highly probable; that is, much more probable than its nonexistence.[9]Braud v. First National Bank of Gonzales, 98-2106 (La.App. 1st Cir.6/23/00), 763 So.2d 829, 833.
In deciding whether a claimant in a workers' compensation action has proven his claimed disability, the totality of the evidence, medical and lay, must be considered. Bass v. National Maintenance Corporation, 95-0367 (La.App. 1st Cir.12/15/95), 665 So.2d 782, 786. The judge's factual determination as to whether the claimant has discharged his burden of proof should not be disturbed on review absent manifest error. Ross v. Remediation Services of Louisiana, 97-2102 (La. App. 1st Cir.5/15/98), 714 So.2d 218, 221. Because of the possibility of symptoms being feigned in mental injury cases, the judge should exercise extreme care in determining whether an employee proved that he suffered such an injury and whether the injury is related to the accident. Perrodin v. St. Landry Parish School Board, 95-1563 (La.App. 3rd Cir.5/22/96), 676 So.2d 612, 616. Moreover, the judge's assessments of the credibility of witnesses or the weight of the medical evidence is not to be disturbed unless clearly wrong. Virgil v. American Guarantee and Liability Insurance Company, 507 So.2d 825, 826 (La.1987). If the judge's findings are reasonable in light of the record reviewed in its entirety, the appellate court may not reverse, even if convinced that it would have weighed the evidence differently had it been sitting as the trier of fact. Stobart v. State, Through Department of Transportation and Development, 617 So.2d 880, 882-883 (La.1993).
Ms. Bethley testified that during the ten years of their marriage prior to the December 18, 1998 accident, Bethley had neither indicated a desire to commit suicide nor received treatment for depression or mental concerns. When she visited him at the hospital following the accident, Bethley complained of being in pain. As a result of his injuries, Bethley was treated surgically for a compound comminuted fracture of the tip of the distal right tibia, a fracture/dislocation of all five tarsal metatarsal joints, and a comminuted fracture of the os calcis, which required the placement of pins in his foot. An open wound on the posterior aspect of the leg necessitated the performance of a skin graft by a plastic surgeon. Bethley was *405 released from the hospital on December, 23, 1998, on pain medications. Ms. Bethley explained that she witnessed Bethley crying in bed one night because of pain.
Based on complaints by Bethley to his orthopedist of continual pain in the right foot and ankle, the pins were removed from his right foot on January 26, 1999. The records of his orthopedist do not reveal that Bethley was on any type of medication at that time; the space allowed for designation of medications was left blank. The record of this visit was the last to note a complaint of pain by Bethley. The orthopedist's physical examination revealed that the skin graft on Bethley's right leg was healing.
On February 15, 1999, Bethley was informed by his plastic surgeon that he would have to undergo another skin graft. According to Ms. Bethley, Bethley was concerned that the condition of his leg would not improve if he did not have the recommended procedure. Ms. Bethley testified that Bethley questioned his doctor at that time about his ability to return to work. He was concerned about his ability to provide for his family in the event that he would not be able to work again.
On February 24, 1999, Bethley's orthopedist observed that his leg was improving; however, he noted that the fracture had not fully healed and that Bethley still had open wounds to the leg that would require additional skin grafts. Based on these findings, the orthopedist opined that Bethley was still totally disabled. Bethley was placed in a right short leg splint and instructed to continue using crutches. He was to return for follow-up care in three weeks. There is no record that Bethley returned to his orthopedist for treatment after February 24, 1999.
Ms. Bethley testified that although Bethley had indicated to her that he was going to take his life, she did not believe him. According to her, the reason Bethley gave for wanting to end his life was that he was tired of not being able to do the things he wanted to do and of being in pain. Ms. Bethley stated that she realized that Bethley was in need of help when she returned from church services the Sunday before his death. She testified that on Monday, March 15, 1999, she contacted a psychiatrist and scheduled an appointment for Bethley for the following Monday, March 22, 1999; Bethley had reportedly attempted to commit suicide by use of a pillow during the prior week. Additionally, during the week prior to his suicide, Ms. Bethley had observed Bethley saying his goodbyes to each family member.[10]
The medical notes of Bethley's plastic surgeon indicated that Ms. Bethley called her office just prior to his death, informed a staff member that Bethley was "going through a depression stage," and sought a referral to a psychiatrist. Her medical notes from a prior visit, possibly on March 15, 1999, indicated that Bethley was almost totally healed, such that it was probably alright to have his leg placed in a cast. Although daily whirlpool therapy ceased on February 14, 1999, his plastic surgeon's notes from what appears to be February 15, revealed that she would try to schedule Bethley's still-needed skin graft; however, she noted that Bethley had informed her that he was unsure whether the workers' *406 compensation carrier would pay for the procedure.
Bethley's disputed claim for workers' compensation benefits was filed on February 25, 1999, with a mediation hearing scheduled for Thursday, March 18, 1999. Meanwhile, during the early morning hours of March 17, 1999, Ms. Bethley went in search of Bethley upon discovering that he was not in bed. She found him standing in the backyard with his back towards a tree. She explained that he came into the house with a smile on his face, and they talked about the past, without mention of the future, until four or five in the morning. Ms. Bethley testified that during this conversation, Bethley assured her that he was not going to kill himself. Afterwards, she went back to bed. Later that same morning when she woke up to get the children ready for school, she noticed that Bethley was not in the den where he said that he would be. She went to the back door and saw him lying against the tree, seemingly asleep. When he did not respond to her calls, Ms. Bethley contacted his parents and sister. Bethley's sister went to where he was sitting and discovered the belt that Bethley had used to hang himself.
Ms. Bethley admitted that Bethley was aware of the upcoming mediation hearing. She stated that Bethley feared being arrested at this hearing because the medical bills relating to his physical injury had not been paid. According to Bethley's sister, Bethley knew that Keller's did not have workers' compensation insurance. The sole owner of Keller's, who testified that coverage had been terminated for nonpayment of premiums, verified this fact. However, Keller's owner testified that when Bethley asked about the availability of insurance to provide coverage for his medical expenses, she informed Bethley that she was working to get things resolved. By the time of his death, three months after his physical injury, no workers' compensation benefits had been paid to or on behalf of Bethley.
According to Ms. Bethley, from the time of his injury until his death, Bethley did not have the use of his leg. She denied that he could walk without the aid of crutches. She testified that their eleven-year-old daughter would drive Bethley to nearby locations when she was not around to take him where he wished to go.
In light of the heightened burden placed on a claimant seeking compensation benefits for a mental injury caused by a physical injury and giving due regard to the deference owed by this court to the workers' compensation judge's factual determinations and apparent assessments of credibility, we are unable to find manifest error in the judge's finding that Ms. Bethley failed to prove by clear and convincing evidence that Bethley's death was causally related to the accident.[11] This determination was reasonably supported by the record. Having failed in her burden of proof as to causation, Ms. Bethley and her children are not entitled to death benefits under LSA-R.S. 23:1031 and 1231.

Decree
For the foregoing reasons, the judgment is affirmed. Costs of this appeal are assessed to Elizzle Bethley, individually and as natural tutrix of her two minor children.
AFFIRMED.
CARTER C.J., dissents without reasons.
NOTES
[1] Judge Ian W. Claiborne, retired from the Eighteenth Judicial District Court, is serving as judge pro tempore by special appointment of the Louisiana Supreme Court.
[2] The workers' compensation judge in this case was Honorable Anthony P. Palermo, of District 5.
[3] On Bethley's disputed claim form, Keller's Concrete was incorrectly identified as Keller Construction.
[4] In addition to his part-time employment with Keller's, Bethley worked for a construction company owned by his father.
[5] The time sheet dated December 18, 1998, discloses that Bethley's rate of pay for December 18, 1998, was $120. The record reveals that he was not paid for that day since his injury occurred early that morning rendering him unable to work.
[6] Because an answer to the appeal was not filed, we pretermit a discussion of MAPP's argument in its brief regarding its calculation of Bethley's average weekly wage.
[7] Louisiana has adopted the Daubert standards for admissibility of expert opinion evidence. State v. Foret, 628 So.2d 1116, 1122-1123 (La.1993).
[8] Although the supreme court granted writs in this case, there has been no further action from the supreme court.
[9] A claimant's own testimony that he experienced debilitating depression after a work-related physical injury, combined with the testimony of family members and a psychologist, can constitute clear and convincing evidence to support a finding that the claimant has suffered a mental injury as a result of the physical injury. Howell v. Service Merchandise Company, Inc., 95-79 (La.App. 3rd Cir.8/9/95), 663 So.2d 96, 100.
[10] Bethley's sister explained that on Tuesday, March 16, 1999, Bethley informed her that he was going to figure out a way to kill himself. According to Bethley's sister, Bethley voiced complaints of pain during their visit on Tuesday. During her visit with Bethley that same Tuesday, Bethley's mother observed that Bethley was restless and appeared to be in a daze. She testified that Bethley did not respond to her remarks about his interest in committing suicide.
[11] Notably, this finding was made by the workers' compensation judge without a determination as to whether Ms. Bethley had shown that Bethley was suffering from a compensable "mental injury" at the time of his death. See LSA-R.S. 23:1021(7)(c) and (d).