LINDA LINDSAY
v.
GREATER NEW ORLEANS EXPRESSWAY COMMISSION AND WILLIAM ODELL FOIL.
No. 2007 CA 0222.
Court of Appeal of Louisiana, First Circuit.
November 2, 2007.
NOT DESIGNATED FOR PUBLICATION.
RANDOLPH C. SLONE, Counsel for Plaintiff/Appellant, Linda Lindsay.
STEPHEN M. MOGABGAB, STEPHEN C. AERTKER, Jr., THOMAS H. HUVAL, CHRISTIAN A. SHOFSTAHL, Counsel for Defendant/Appellee, Louisiana Insurance Guaranty Association.
MICHAEL E. PARKER, Counsel for Defendants/Appellees, Greater New Orleans Expressway, Commission and William Odell Foil.
Before WHIPPLE, GUIDRY, AND HUGHES, JJ.
HUGHES, J.
This is an appeal by a plaintiff, injured in a motor vehicle accident, from an award of damages, claimed to be insufficient. For the reasons that follow, we affirm.

FACTS AND PROCEDURAL HISTORY
On March 29, 2000, defendant William Odell Foil rear-ended a car driven by plaintiff, Linda Lindsay, on an I-12 exit ramp in Tangipahoa Parish.[1] Ms. Lindsay immediately complained of shoulder pain and stated she had had a prior back surgery. The Louisiana State Trooper investigating the accident, Louis Culotta, found no visible damage to the vehicles. Mr. Foil testified at trial that his vehicle's bumper had a black smudge from contact with a black plastic strip on the plaintiffs car bumper.
Ms. Lindsay had numerous pre-existing medical conditions, but contended that the accident caused a herniation of a cervical disc, related pain and suffering, and an increased frequency of migraine headaches. The trial court awarded plaintiff $75,000.00 in general damages, along with $25,000.00 in medical expenses, finding that plaintiff sustained only a muscular/ligamentous cervical strain, rather than a herniated cervical disc, as a result of the accident. Ms. Lindsay appeals this judgment, and contends she is entitled to past and future special damages of $1,325,019.06, and that the $75,000.00 general damage award was abusively low.

LAW AND ANALYSIS

Trial Court's Failure to Award Damages for Cervical Disc Herniation
On appeal, the issue to be resolved by a reviewing court is not whether the trier-of-fact was right or wrong, but whether the factfinder's conclusion was a reasonable one. Stobart v. State, Department of Transportation and Development, 617 So.2d 880, 882 (La. 1993). Where factual findings are based on determinations regarding the credibility of witnesses, the trier-of-fact's findings demand great deference. Boudreaux v. Jeff, XXXX-XXXX, p. 9 (La. App. 1 Cir. 9/17/04), 884 So.2d 665, 671; Secret Cove, L.L.C. v. Thomas, 2002-2498, pp. 6-7 (La. App. 1 Cir. 11/7/03), 862 So.2d 1010, 1016, writ denied, XXXX-XXXX (La. 4/2/04), 869 So.2d 889. The trier-of-fact is empowered to accept or reject, in whole or in part, the testimony of any witness deemed lacking in credibility. Verges v. Verges, XXXX-XXXX, p. 10 (La. App. 1 Cir. 3/28/02), 815 So.2d 356, 363, writ denied, XXXX-XXXX (La. 9/20/02), 825 So.2d 1179. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. Stobart v. State, Department of Transportation and Development, 617 So.2d at 883; Wright v. Bennett, XXXX-XXXX, p. 25 (La. App. 1 Cir. 9/28/05), 924 So.2d 178, 193.
In this case, the trial judge rendered written reasons for judgment, stating, in pertinent part:
After back surgery in August 1996, plaintiff continued to request pain medications. Plaintiff was very depressed before the accident of 3/29/2000. She has a long history of severe migraines which she says increased in frequency after this MVA ["motor vehicle accident"].
The [MVA] in question occurred on 3/29/2000. Trooper Culotta testified that he saw no visible sign of damage to the vehicles. Trooper Foil saw only the paint smudge where the front corner of his vehicle hit the rear bumper of plaintiffs vehicle. Both troopers testified that they saw no visible sign of physical injury to plaintiff. She complained of burning pain in [her] left shoulder and left neck.
On 03/30/2000, plaintiff went to the emergency room with complaints including minimal pain to [her] posterior neck and head as a result of a whiplash type injury. X-rays were taken at St. Tammany Parish Hospital. These were read by a radiologist at Ochsner on 6/6/00 and 6/7/00. At that time, the plaintiff had advanced degenerative changes at the lumbrosacral level, degenerative disc disease at T11-T12 and slight lumbar scoliosis. There were other abnormalities noted. The C6-C7 disc space showed some minimal narrowing. Disc spaces were maintained. There was no significant impingement on neural foramina seen, and no other abnormality.
Plaintiff did not again complain of neck pain until some two months post-MVA. On 5/12/00, Dr. McFarland noted that she had full range of motion in her neck, which was supple, and no symptoms of nerve impingement. Similarly, Dr. Bendrick found her neck supple with full range of motion; he did not prescribe physical therapy for the neck or other treatment of cervical disc injury. The x-rays taken on 6/6/2000 showed some minimal narrowing at [the] C6-7 disc space, but disc spaces were maintained. No significant impingement was seen on the neural foramina, and no other abnormality.
On 7/31/2000, a Clearview Medical MRI reading found the "old surgical laminectomy defect at L5-S1 level", post-surgical findings, advanced severe degenerative disc disease, prior partial discectomy at L5-S1, stenosis [of the] L5-S1 neural foramina, substantially dehydrated L3-4, L4-5 discs, old or chronic paracentral herniation of [the] T11-T12 disc which was narrow and dehydrated. These conditions were not related to the accident by the physicians. The plaintiff was involved in a very low-impact collision as above noted.
Dr. Gutnisky reviewed the myelogram and C-T scan performed by Delta Imaging on 10/15/2001, and observed degenerative changes and bulging discs, but no clear herniation which would cause nerve compression.
The 8/14/2001 MRI examined by Dr. Keppell did not show any definite disc herniation of the upper three cervical disks. The report noted broadly based posterior projections of disc at C5-6 and 6-7 levels thought most likely to be actual disc herniation. However, Dr. Lopez noted that the 2 to 3 milliliter [sic] bulge or spurring is called a herniation only because it has broken through some fibers. The repeat MRI on 9/6/2001 showed degenerative changes at the C5-6 level. Dr. Lopez stated that the combination of disc bulging and spurring would cause aggravation on the nerve roots going to the left ann. She felt the neck pain and chronic spasm of related muscles were related to the MVA.
Dr. Frieberg regarded the post-accident complaint as lumbar strain and that the back problem did not really persist for a long time. He did however review an MRI prior to the 10/16/2000 visit. He felt that the disc protrusion in the C6-C7 level caused plaintiffs pain and stiffness in [the] neck, and pain to [the] left shoulder and arm. He felt this caused some of the headache problem, but not the vast majority of the headache problem. He noted that the causes of plaintiffs problems were depression, chronic pain, and musculoskeletal. He felt the myelogram showed inflammation of the vertebrae (spondylitis) and progressive radiculopathy. He felt the MVA caused the neck problems, resulting in pain and increased headaches, and a different type of severe headache. He felt that the C6-7 herniated disc was caused by the MVA and caused an impingement on the nerve, a pinched nerve. He felt that with pain management, the plaintiff could return to work.
No mention is made in Dr. Shames['s] notes of neck pain in the April 17, May 15 and July 24, 2000 visits. Plaintiff had a history of headaches dating back at least to 1973. Also in July 1973, Dr. Shames noted that she had pain in [the] paravertebral area; it hurt [her] to move [her] neck, but no other mention [is made] of neck problems until [the] MVA. Dr. Shames felt a trauma could worsen degenerative joint disease. However, Dr. Shames noted that there was no mention of significant disc bulging at C1 and C2 which is where occipital headaches would be generated. But, he did agree that the trauma sustained in the MVA could be a contributing cause of the headaches. He noted that a forarninal impingement on [the] lower cervical spine could cause the arm pain. However, Dr. Gutnisky had not found any herniation. Dr. Rabito examined plaintiff on 10/22/2001 and found no significant limitations in range of motion in the cervical and lumbar spine and no abnormal neurological findings.
The plaintiff claims she has sustained [an] aggravation of [her] pre-accident condition and symptoms of headaches and lower back pain. Doctors Gutnisky, Frieberg and Lopez generally concur that she has stenosis and degenerative conditions at C5-6 and C6-7. Dr. Lopez agreed that plaintiff sustained cervical strain. Dr. Frieberg diagnosed radiculopathy in [plaintiffs] left arm, caused by the trauma incurred in the MVA. Dr. Gutnisky agreed her complaints were primarily headache and arm pain.
On the other hand, the plaintiff had numerous conditions pre-existing the accident, including back pain and depression, frequent severe headaches, and continuing pain evidenced by pain medications which she regularly received for the years preceding the accident. She complained of severe headaches both pre-dating and after two accidents in 1978. She regularly required pain pills, since 1984 from Dr. Shames. Her sister and daughter both testified that she is unable to perform chores such as mopping or vacuuming. Plaintiff cannot drive for long periods. But Dr. Shames in 1999 noted that plaintiff could not cook for herself and was then extremely depressed. Dr. Roniger noted that plaintiff had, prior to the MVA, suffered from personality disorder and a long history of psychiatric problems. He found her to be functionally disabled. Dr. Lopez felt that, though the plaintiff "may be functionally disabled", she did not find plaintiff to be "disabled", as in physically unable to think and to work.
Plaintiff was working at the time of the accident, but had just begun the job with the Census [Bureau] on February 6th of that year. She had worked for less than two months at the time of the accident. The plaintiff had a sporadic work history. She had prior to the MVA applied for social security disability based on total and permanent disability as a result of conditions which arose on 7/13/1996. In 1997, she had earned income of $233.[00]; in 1998, $19,630[00]. In 1999, she did not work and had no income. She had last worked to full capacity as an LPN in 1998. The plaintiff claimed that she had been unable to work because of her own disabling condition which existed on July 13, 1996 and continually existed through her application dated ... 3/15/2001. When awarded benefits retroactive to her initial application date of 12/31/1998, the SSA [Social Secuity Administration] determined that any attempt to work subsequent to that date was unsuccessful.
The plaintiff was already disabled as concerns her ability to work. That disability existed before this accident and throughout this period subsequent to the MVA. The Court finds that evidence showed that the plaintiff was disabled before the accident and at the time of the accident, and would not have been able to work in the future. Though the plaintiff was employed, the Court doubts that she would have been able to retain long-term employment. She did not claim any change in her condition on 3/15/01 from that of 7/13/96 and 12/31/98. The Court does not award past or future lost wages. ...
The plaintiff must mitigate her damages, and also assist in her therapy and care regime. Dr. Lopez noted that the plaintiff "...is not participating in her own care; she's not a teammate in her self-care; she's not working on herself" Dr. Lopez noted that the plaintiffs daughter had stated that her mother was not interested in going into a rehab facility. ... Dr. Lopez felt that the plaintiff needed a regimen of therapy which would not be narcotic based, but consist of lifestyle changes and care of the entire body. ... She did attribute the neck problems and pain to the MVA. Dr. Lopez felt that the plaintiff could regain a quality of life with proper help and intervention. She stated in her assessment of the plaintiffs condition: "I don't think she's disabled." ...
The Court finds that the evidence proves that the plaintiff sustained a soft tissue injury, musculo-ligamentous strain in the cervical area, together with spasm of the cervical muscles, as a result of the accident. There was conflicting testimony among the physicians as to whether the plaintiff has a cervical disc herniation. The Court finds that the plaintiff has failed to prove by a preponderance of the evidence that the past and future medical expenses for which she is seeking judgment were caused by the injuries resulting from this accident. The plaintiff had numerous pre-existing and degenerative conditions. The Court finds that the plaintiff has not proven by a preponderance of the evidence that these items, particularly the future pharmaceuticals and long-term care and pain management, result from injuries suffered in this accident.
[Footnotes and record references omitted.]
On appeal, plaintiff makes the argument to this court that the trial court's ruling that she suffered only a soft tissue injury was manifestly erroneous and contrary to the weight of uncontradicted and overwhelming medical evidence. Further, plaintiff contends, citing Dickerson v. Zurich-American Insurance Co., 479 So.2d 571 (La. App. 1 Cir. 1985), that where, as in this case, the trial court relied on depositions "the rules of Arceneaux v. Domingue, supra, do not apply because the trial court is unable to observe the demeanor of the witness and the trial court is in no better position to assess credibility than the appellate court," asserting that, in such a case, "the appellate court must determine the sufficiency and the preponderance of the evidence." (Underscoring omitted.)
However, plaintiff/appellant's reliance on Dickerson is misplaced, as the supreme court in Shephard on Behalf of Shepard v. Scheeler, 96-1690, p. 13 (La. 10/21/97), 701 So.2d 1308, 1315, recognized that Dickerson was jurisprudentially abrogated by Virgil v. American Guarantee and Liability Insurance Company, 507 So.2d 825, 826 (La. 1987). The supreme court ruled that Louisiana's three-tiered court system allocates the fact finding function to the trial court and because of this institutional function great deference is accorded to the trial court's factual findings, even when the record consists solely of documentary evidence. Shephard on Behalf of Shepard v. Scheeler, 96-1690 at pp. 13-14, 701 So.2d at 1315-16; Virgil v. American Guarantee and Liability Insurance Company, 507 So.2d at 826. Quoting Canter v. Koehring Company, 283 So.2d 716, 724 (La. 1973), the Shephard court stated that " [t]he reason for this well-settled principle of review is based not only upon the trial court's better capacity to evaluate live witnesses (as compared with the appellate court's access only to a cold record), but also upon the proper allocation of trial and appellate functions between the respective courts." Shephard on Behalf of Shepard v. Scheeler, 96-1690 at p. 14, 701 So.2d at 1316. Further, the court reasoned:
The rigid and strenuous application of manifest error review has served the judicial process well. A lesser standard, albeit when a case is submitted to the trial court solely upon a written record, unduly undermines the allocation of the fact finding function to the trial courts.
Id. In reaffirming Virgil v. American Guarantee and Liability Insurance Company, the Shephard court concluded that the proper allocation of trial and appellate functions between the respective courts is better served by the heightened standard of manifest error review. Shephard on Behalf of Shepard v. Scheeler, 96-1690 at p. 15, 701 So.2d at 1317.
Plaintiff/appellant further argues that there is no conflict in the medical testimony or lay testimony she presented, and questions how it can be logically reasoned that any conflict exists regarding her injuries "when the defendants' only medical expert (IME neurologist, Dr. Jeanette Lopez)[] agreed with, clarified and expounded upon plaintiffs injuries." Plaintiff also contends that defendants' only attempt to cast any doubt on the findings of her medical experts was "in the form of a psychiatrist, Dr. Richard Roniger, who merely reviewed records and admitted that he had never met or examined plaintiff or even attempted to consult with any of her treating physicians."
In making this argument, plaintiff/appellant overlooks the underlying factual assertions that necessarily serve as the foundation upon which all of her medical evidence is based; i.e. plaintiffs own statements to the medical providers relating her damages to the accident in question rather than to any prior or subsequent injury. Clearly, Ms. Lindsay had pre-existing headaches, depression, and lower back problems, which she claims were aggravated by the accident, but she also claims that her neck problems arose from this accident. Medical evidence presented to the trial court indicates that Ms. Lindsay's cervical condition could be the result of either degenerative changes or trauma. The doctors who testified relating the cervical condition to the accident did so based on the history provided to them by Ms. Lindsay. Therefore, the trial court's determination as to Ms. Lindsay's credibility was an important factor in deciding this case. Because two reasonable interpretations of the evidence were possible in this case (either plaintiffs cervical disc abnormality was caused by degenerative changes or it was caused by the motor vehicle accident trauma), the trial court's choice between these two alternatives cannot be manifestly erroneous.
Implicit in the trial court's factual finding that Ms. Lindsay suffered only a "musculo-ligamentous strain in the cervical area," is the finding by the trial court that Ms. Lindsay's cervical disc condition was degenerative in nature and not caused by this accident. Consequently, the general damage award of the court, in the amount of $75,000.00, was not an abuse of discretion for a cervical soft tissue injury. Nor do we find the trial court's rejection of plaintiffs other damage claims erroneous, based on the facts found by the trial court.[2]

Admission of Expert Medical Testimony
The only remaining assignment of error presented by plaintiff for review by this court is the admission by the trial court of the testimony of Dr. Romger.
All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, the Constitution of Louisiana, this Code of Evidence, or other legislation. Evidence that is not relevant is not admissible. LSA-C.E. art. 402. "Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. LSA-C.E. art. 401. If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise. LSA-C.E. art. 702.
When faced with a proffer of expert scientific testimony, a trial judge must determine at the outset whether the expert is proposing to testify to scientific knowledge that will assist the trier of fact to understand or determine a fact in issue. This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue. In fulfilling this gatekeeping role, the trial judge must ensure that the proffered evidence is not only relevant, but reliable, by utilizing a flexible approach requiring that consideration be given to factors such as whether the technique can be (and has been) tested, whether it has been subjected to peer review and publication, whether there is a known or potential rate of error, and whether the relevant scientific/expert community generally accepts the technique. Bethley v. Keller Construction XXXX-XXXX, pp. 5-6 (La. App. 1 Cir. 12/20/02), 836 So.2d 397, 402, writ denied, XXXX-XXXX (La. 4/21/03), 841 So.2d 792 (citing Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and Independent Fire Insurance Company v. Sunbeam Corporation, 99-2181, pp. 12-13 (La. 2/29/00), 755 So.2d 226, 234). A trial judge has broad discretion in determining whether to admit expert testimony in a particular case. Ultimately, the trial judge's decision to admit or exclude expert testimony is subject to the abuse of discretion standard of review. Bethley v. Keller Construction XXXX-XXXX at p. 7, 836 So.2d at 403.
In the instant case, the trial judge admitted the testimony of Dr. Roniger and accepted him as an expert in the field of psychiatry, finding that his testimony would be of assistance to the court. After reviewing the trial court record and jurisprudence on this issue, we are unable to say the trial court abused its much discretion in admitting this testimony.

CONCLUSION
For the reasons assigned herein, the judgment of the trial court is affirmed. All costs of this appeal are to be borne by plaintiff/appellant, Linda Lindsay.
AFFIRMED.
NOTES
[1] At the time of the accident, Mr. Foil was a patrol officer with the Greater New Orleans Expressway Commission, engaged ill the course and scope of his employment. At the time of trial, he was employed by the Mandeville Police Department.
[2] In particular, although the trial court found the plaintiff was disabled before the accident at issue in this case, we note that plaintiff earned $19,630.00 in 1998. However, we conclude that the plaintiff did not carry her burden of proving that her failure to be subsequently employed was attributable to this accident. Therefore, we cannot say the trial court erred in refusing to make an award for lost wages.