713 So.2d 655 (1998)
Carlton TRAWEEK, Plaintiff-Appellee,
v.
CITY OF WEST MONROE, Defendant-Appellant.
No. 30571-WCA.
Court of Appeal of Louisiana, Second Circuit.
May 13, 1998.
Rehearing Denied June 18, 1998.
*657 Hayes, Harkey, Smith & Cascio by C. Joseph Roberts, III, Monroe, for Defendant-Appellant.
C. Daniel Street, Monroe, for Plaintiff-Appellee.
Before BROWN, WILLIAMS and CARAWAY, JJ.
CARAWAY, Judge.
In this worker's compensation action, the employer appeals the award of disability benefits, and the employee answers contesting the award of credits and offsets and the denial of penalties and attorney's fees. Finding that the trial court correctly determined that the employee's post-traumatic stress disorder resulted from a personal injury by accident arising out of his employment, a physicalmental claim, we affirm the award of disability benefits, amending the judgment *658 only with regard to the award for credits and offsets which were not proven.

Facts and Procedural History
Carlton Traweek began his employment as a police officer with the West Monroe Police Department in 1978. During Traweek's tenure with the department, he served as a patrolman, detective, sergeant and shift supervisor. In March 1995, Traweek's physical condition deteriorated causing him to be put on sick leave. After consulting with a cardiologist regarding his physical condition, Traweek was advised to seek a psychiatric consultation.
In June 1995, Traweek began treatment with Dr. J. Roderick Hundley, a psychiatrist. Dr. Hundley kept plaintiff off of work and on sick leave while he began therapy. Traweek stated that his problems started after the beginning of 1995 with trouble in his work environment. Traweek reported that he was having difficulties with the younger officers he supervised and that in January 1995, he had first felt fear in pursuit of his police duties when a traffic stop revealed that the car's occupants were armed. Traweek also recounted problems sleeping, loss of appetite, diminished concentration, increased irritability, morbid thoughts and hearing voices. Dr. Hundley initially diagnosed plaintiff as having major depressive disorder, single episode with psychotic features and prescribed an antidepressant and an anti-psychotic.
In December 1995, after plaintiff expressed a desire to return to work, Dr. Hundley decided that Traweek could return to light duty with no supervisory responsibilities and no involvement with young police officers. Dr. Hundley wrote a note to this effect to Larry LaBorde, the West Monroe Chief of Police and a close personal friend of Traweek. Nevertheless, LaBorde informed Traweek that there was no such thing as light duty and that he would confer with Dr. Hundley. While Dr. Hundley testified that it was not his intention that Traweek immediately return to his old job with the police department, he acquiesced to it because of plaintiff's desire to go back to work and LaBorde's statement that light duty was not available.
Traweek's first shift was on December 31, 1995. During claimant's absence from the police force, LaBorde had decided to add organic pepper spray as a defensive weapon for all patrol officers and to require that every officer carry it and be trained in its use. The culmination of the training involved being sprayed in the face with the agent. Upon his return to work, Traweek was informed of the training and scheduled for an instructional class on January 5, 1996.
On January 5, 1996, following the classroom instruction provided to the officers on the properties, effects and use of the pepper spray, Traweek advised the captain in charge that he "did not want to be sprayed." The captain referred plaintiff to LaBorde but LaBorde declined to exempt Traweek from the exercise. LaBorde did offer to delay the spraying for a week to allow Traweek to be sprayed at the same time that LaBorde would be sprayed. Claimant declined this offer and was sprayed with the pepper spray on January 5, 1996. Following this incident, Traweek returned to work for a few days and worked until January 17, 1996.
On plaintiff's next visit with Dr. Hundley, January 18, 1996, Traweek mentioned the pepper spray incident and that he was upset by it. On January 23, 1996, Dr. Hundley's progress notes first report a diagnosis of post-traumatic stress disorder ("PTSD"). On that date, Traweek telephoned Dr. Hundley extremely agitated and distressed. Dr. Hundley informed LaBorde that he felt it was inappropriate for Traweek to continue carrying a gun as a patrol officer. Traweek did not return to work after January 17, 1996 and was placed back on sick leave.
In therapy, Traweek focused intensely on the pepper spray experience. Fearing that plaintiff was a threat either to himself or others, specifically LaBorde, Dr. Hundley hospitalized Traweek for five days in April 1996. The hospital psychiatrist's diagnoses essentially agreed with those of Dr. Hundley, major depressive disorder and PTSD. Although Traweek applied for another year of sick leave benefits, this request was denied, and after exhausting his 365 days of sick *659 leave, Traweek retired from the police department on April 13, 1996.
At trial, Traweek reported that the period of hospitalization and other treatment had calmed him down, but Dr. Hundley reported there has been no significant improvement in his PTSD since May 1996. Dr. Hundley opined that the pepper spray incident and resultant PTSD contributed to Traweek's inability to perform his job. The employer presented the testimony of Dr. Paul Ware, a psychiatrist who had reviewed all of plaintiff's medical records but had not evaluated him. In Dr. Ware's opinion, the major depressive diagnosis was correct but there was inadequate support for the diagnosis of PTSD. Dr. Ware also agreed that Traweek could not return to his work as a police officer in his present condition.
Traweek testified that he initially received advice from LaBorde that his mental disability and therapy which prevented him from working in 1995 was not covered by worker's compensation. Following the pepper spray incident and the exhaustion of his sick leave benefits from the department, he filed this claim for disability.
Following trial, the Office of Worker's Compensation tribunal ("OWC") reviewed plaintiff's claim under both La. R.S. 23:1021(7) subsections (b) and (c), infra, to determine whether Traweek's mental condition allowed for compensation under either the so-called mental-mental provision of subsection (b) or the physical-mental provision of subsection (c). The OWC first determined that Traweek's mental illness had not resulted from "sudden, unexpected and extraordinary stress" related to his duties as a police officer and denied Traweek's mental-mental claim. The stressful events related to Traweek's work, including the pepper spray incident, were found to be "typical line of duty occurrences" for a police officer.
Regarding plaintiff's physical-mental claim, the OWC ruled that Traweek's PTSD had resulted from the pepper spray incident which the OWC described as "an injurious and traumatic event." This established PTSD as a "mental injury" under La. R.S. 23:1021(7)(c), and the defendant was ordered to make payment of weekly worker's compensation benefits in the amount of $330 from April 13, 1996 until Traweek is released to return to work by Dr. Hundley.[1] The OWC further found claimant entitled to medical benefits including psychiatric care and ordered defendant to insure payment of all medical expenses associated with the January 5, 1996 incident and reimburse Traweek for all out-of-pocket medical expenses after January 5, 1996. The OWC held defendant entitled to credits and offsets for any benefits or salaries received by claimant since April 13, 1996 in accordance with the worker's compensation laws and denied plaintiff's request for penalties and attorney's fees.

Applicable Worker's Compensation Law
In order to recover benefits under Louisiana Worker's Compensation Law, an employee must establish that he received a personal injury by accident arising out of and in the course of his employment. La. R.S. 23:1031(A). An "accident" is defined as "an unexpected or unforeseen actual, identifiable, precipitous event happening suddenly or violently, with or without human fault, and directly producing at the time objective findings of an injury which is more than simply a gradual deterioration or progressive degeneration." La. R.S. 23:1021(1). The worker's' compensation law limits compensable "injuries" to "include only injuries by violence to the physical structure of the body and such diseases or infections as naturally result therefrom." La. R.S. 23:1021(7)(a). Where a mental injury or illness develops secondary to a physical injury sustained in a work-related accident, an employee is entitled to compensation benefits for any disability resulting from the mental injury and to reimbursement for mental treatment medical expenses. Sparks v. Tulane Med. Ctr. Hosp. & Clinic, 546 So.2d 138 (La.1989).
*660 La. R.S. 23:1021(7)(b), (c) and (d) provide, in pertinent part, as follows:
(b) Mental injury caused by mental stress. Mental injury or illness resulting from work-related stress shall not be considered a personal injury by accident arising out of and in the course of employment and is not compensable pursuant to this Chapter, unless the mental injury was the result of a sudden, unexpected, and extraordinary stress related to the employment and is demonstrated by clear and convincing evidence.
(c) Mental injury caused by physical injury. A mental injury or illness caused by a physical injury to the employee's body shall not be considered a personal injury by accident arising out of and in the course of employment and is not compensable pursuant to this Chapter unless it is demonstrated by clear and convincing evidence.
(d) No mental injury or illness shall be compensable under ... Subparagraph ... (c) unless the mental injury or illness is diagnosed by a licensed psychiatrist or psychologist and the diagnosis of the condition meets the criteria as established in the most current issue of the Diagnostic and Statistical Manual of Mental Disorders presented by the American Psychiatric Association.
Thus, in order to obtain compensation benefits for a mental injury caused by a physical injury, (1) the claimant must prove by clear and convincing evidence that the physical injury caused the mental injury, (2) the mental injury must be diagnosed by a licensed psychiatrist or psychologist, and (3) the diagnosis must meet the most current criteria established by the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders. Charles v. South Central Industries, 96-0883 (La.11/25/96), 683 So.2d 706. The "clear and convincing" standard is a heavier burden of proof than the usual civil case of "preponderance of the evidence" standard but is less burdensome than the "beyond a reasonable doubt" standard of a criminal prosecution. Bundren v. Affiliated Nursing Homes, Inc., 94-808 (La.App. 3d Cir. 02/01/95), 649 So.2d 1177. To prove a matter by clear and convincing evidence means to demonstrate that the existence of a disputed fact is highly probable; that is, much more probable than its nonexistence. Hines v. Williams, 567 So.2d 1139 (La.App. 2d Cir.), writ denied, 571 So.2d 653 (La.1990).
It is well established that the worker's compensation act is remedial in nature, and that provisions of the worker's compensation law should be liberally construed in favor of the claimant. Daugherty v. Domino's Pizza, 95-1394 (La.05/21/96), 674 So.2d 947. Although compensation laws are to be construed liberally in the claimant's favor, the worker's burden of proof is not relaxed. See, Harold v. La Belle Maison Apartments, 94-0889 (La.10/17/94), 643 So.2d 752. Disability can be proven by medical and lay testimony and the OWC's factual determination whether the worker has discharged his burden of proof should not be disturbed on review absent manifest error. See, Freeman v. Poulan/Weed Eater, 93-1530 (La.01/14/94), 630 So.2d 733. Nevertheless, reviewing courts must analyze claimed disability caused by mental conditions with utmost caution in view of the nebulous characteristics of mental conditions and the possibility of symptoms being easily feigned. Westley v. Land & Offshore, 523 So.2d 812 (La.1988).

Discussion

Was the predicate accident and physical injury established for plaintiff's claim of mental injury?
The City argues forcefully that the pepper spray incident was not an accident and inflicted no physical injury. From the definition of accident under the worker's compensation act, it is asserted that there was no "precipitous event ... directly producing at the time objective findings of an injury." La. R.S. 23:1021(1).
The requirement for an accident, however, does not mean that a controlled training exercise, such as the pepper spray incident, cannot lead to accidental consequences. See, Smith v. Brown Paper Mill Co., Inc., 152 So. 700 (La.App. 2d Cir.1934), holding that a planned injection of typhoid *661 serum in the arm of a paper mill employee by a trained nurse employed by the mill, resulting in paralysis, was an "accident" within the worker's compensation law. As Malone & Johnson correctly notes, "So long as a definite event can in some way be carved out of the general working experience of the employer, and this event can be pointed to with some assurance as the connecting link between employment and injury, the courts have been satisfied to classify such an event as an accident." Malone & Johnson, 13 Louisiana Civil Law Treatise, Workers' Compensation, § 214.
Nevertheless, the City argues that this event, even assuming that it amounted to an accident, did not first produce physical injury, the essential predicate for mental injury under La. R.S. 23:1021(7)(c). From our reading and understanding of this definition for "mental injury caused by physical injury," there is no mandate that the physical injury experienced by the employee must itself rise to the level of compensable injury of a physical nature under La. R.S. 23:1021(7)(a). Nevertheless, a physical injury established by objective findings at the time of the event must be clearly shown and the claimed mental illness must be clearly linked to that objective, physical event.
In this case, it is undisputed that the administering of pepper spray into the face of the plaintiff caused a significant physical trauma, momentarily debilitating, by causing a burning sensation to the skin, irritation of mucosa of the eyes, throat and nose, and difficulty breathing. This physical trauma presents a clear objective finding of a physical injury. It matters not that the physical injury is short-lived with virtually no risk of lasting physical effects. The critical inquiry is whether conclusive psychiatric testimony can link this physical trauma as the cause of the mental illness of the employee.
In summary, the definitional language of the various statutory provisions upon which the City relies should not be technically construed to defeat the remedial nature of the act. We are satisfied that a specific work-related event produced objective findings of physical trauma to the plaintiff. As we next review the sufficiency of the psychiatric criteria for the diagnosis of PTSD, we will further consider whether the unexpected occurrence of plaintiff's mental illness was clearly and convincingly shown to be caused by the physical trauma of the pepper spray incident.

Was the medical diagnosis of PTSD in compliance with La. R.S. 23:1021(7)(d)?
At the hearing, evidence demonstrated that two licensed psychiatrists, Dr. Hundley and Dr. Aris Cox, both treating physicians of Traweek, diagnosed claimant with PTSD resulting from the pepper spray training incident. Dr. Hundley made this diagnosis in January 1996, shortly after the occurrence of the incident. Traweek had been in therapy with Dr. Hundley since June 1995, but Dr. Hundley testified that he saw no signs of PTSD until plaintiff was sprayed with the pepper mace. The only psychiatric evidence disagreeing with the diagnosis of PTSD and the causal link between the disorder and the pepper spray incident came from Dr. Paul Ware, defendant's expert, who did not examine Traweek but only reviewed his medical records and observed him testifying.
The statute provides that for a mental injury to be compensable, it must be diagnosed by a licensed psychiatrist or psychologist and must meet the criteria established in the most current issue of the Diagnostic and Statistical Manual of Mental Disorders presented by the American Psychiatric Association. La. R.S. 23:1021(7)(d). This diagnostic criteria for PTSD, introduced into evidence, included, in pertinent part:
A. The person has been exposed to a traumatic event in which both of the following were present: (1) the person experienced, witnessed, or was confronted with an event or events that involved actual or threatened death or serious injury or a threat to the physical integrity of self or others (2) the person's response involved intense fear, helplessness, or horror ...
B. The traumatic event is persistently reexperienced in one (or more) of the following ways: (1) recurrent and intrusive distressing recollections of the event ... (3) acting or feeling as if *662 the traumatic event were recurring...
C. Persistent avoidance of stimuli associated with the trauma and numbing of general responsiveness (not present before the trauma), as indicated by three (or more) of the following: (1) efforts to avoid thoughts, feelings, or conversations associated with the trauma (2) efforts to avoid activities, places, or people that arouse recollections of the trauma ... (7) sense of a foreshortened future (e.g. does not expect to have a career, marriage, children, or a normal life span)
D. Persistent symptoms of increased arousal (not present before the trauma), as indicated by two (or more) of the following: (1) difficulty falling or staying asleep (2) irritability or outbursts... (3) difficulty concentrating (4) hypervigilance (5) exaggerated startle response
E. Duration of the disturbance ... is more than one month.
F. The disturbance causes clinically significant distress or impairment in social, occupational, or other important areas of functioning.
Diagnostic and Statistical Manual of Mental Disorders, Section 309.81, American Psychiatric Association (4th ed.1994).
Although while testifying, Dr. Hundley did not specifically articulate each criteria for PTSD and how Traweek's illness fit those guidelines, we find that this technicality is not dispositive in this case. See, Bundren, supra. His testimony touched upon each of the above listed criteria in a sufficient manner. PTSD is a recognized diagnosis in the Diagnostic and Statistical Manual of Mental Disorders, and Dr. Hundley acknowledged his familiarity with and reference to the criteria for PTSD. Dr. Cox's diagnosis of PTSD was contained as both an initial and discharge diagnosis from plaintiff's hospital stay. Even defendant's expert, Dr. Ware, stated that a hospital discharge diagnosis which follows the clinical course is the physician's final opinion and thus the most reliable.
Plaintiff testified that when sprayed with the pepper mace, he had difficulty breathing and was afraid he was going to die. Officer Sutton, who observed the exercise, stated that she was concerned about the severity of claimant's reaction to the spray and Officer Stan Hayden, who conducted the pepper spray training, said that Traweek's reaction was more severe than most of the other officers. Officer Hayden testified that claimant appeared apprehensive about being sprayed with the pepper mace. During the training, the policemen were told that the psychological effects that accompany being sprayed with the pepper mace include a panic factor and a loss of the will to fight. Dr. Hundley confirmed that plaintiff perceived the event at the time of the experience as being traumatic and life-threatening. In Dr. Hundley's opinion, regardless of how other participants might have viewed the event, the patient's perception of the traumatic event as life-threatening meets the criteria for PTSD.
Following the administration of the pepper spray, the officers were led to buckets of water and hoses with running water and allowed to "decontaminate." At the trial, Traweek and Dr. Hundley articulated that in the weeks and months after the exercise, claimant experienced several instances of "reliving" the incident including having a choking sensation and waking up with his eyes burning and being outside putting water or ice on his eyes without knowing how he got outdoors. Dr. Hundley related that Traweek's persistent recountings of the event are vivid with minute detail of the trauma. Traweek becomes greatly agitated in expressing those recollections of the event.
The City further argues that Dr. Hundley never demonstrated that the pepper spray event was more than just one part of a larger "snowball" of workrelated stressors that were building throughout the year preceding the January 1996 event. Dr. Hundley, however, answered that contention by reviewing the notes of his January 18 and 23, 1996 consultations with Traweek. Although he admitted that the symptoms of Traweek's former state of depression were present, what Dr. Hundley began to see following the pepper spray incident was fairly described by *663 him from the notes of those consultations, as follows:
A. I don't think that there was just one event. I think that the stress at work, the problems that he perceived with the younger officers, the mace experienceI think there are a number of things which contributed to his arrival at that point where he just could no longer function. The experience with the mace, which apparently seems fairly important, I think was an experience hethat occurred which frightened him, that he tried not to think about, that he was somewhat numb from, and as he began to think more and more and more about it, it became extremely intrusive and intense for him....
With information in the diagnostic manual indicating that the onset of PTSD can occur some weeks after the traumatic event, Dr. Hundley's recognition of PTSD by January 23, 1996 appears timely and reports a significant and distinct benchmark in Traweek's mental condition which was tied to a physical injury. From our review of the evidence, we cannot say that if the pepper spray incident had not occurred, that Traweek would have clearly lapsed into the state of mental disability that he now exhibits. The OWC's conclusion that Dr. Hundley's assessment of his patient was sufficiently based upon the above diagnostic criteria, despite Dr. Ware's conflicting opinion, is not clearly wrong, and we find no manifest error.

Did the defendant prove entitlement to credits and offsets?
The plaintiff answers defendant's appeal urging that the OWC erred in holding that the employer "is entitled to credits and offsets for any benefits or salaries received by claimant since April 13, 1996 in accordance with the Workers' Compensation Act." Claimant asserts this was a matter to be litigated at the trial and the defendant failed to present any evidence of an entitlement to such credit or the amount thereof.
The worker's compensation law addresses reductions allowed to be taken when other benefits are payable. La. R.S. 23:1225. It has been established that an employer must make a judicial demand in order to claim such an offset under La. R.S. 23:1225. See, LeStage v. Town of Chatham, 26,676 (La.App.2d Cir. 03/01/95), 651 So.2d 329. The City of West Monroe made such a demand in its answer to claimant's petition claiming that if the court determined that Traweek was entitled to benefits, it was entitled to an offset "for any and all other benefits received by claimant including, but not limited to, social security; pension; health care; unemployment compensation; outside income and any and all such other benefits." Nevertheless, the employer must prove its entitlement to the offset by a preponderance of the evidence. LeStage, supra.
From our review of the record, the only evidence presented of benefits being received by Traweek is that he receives a pension from the City following his retirement. La. R.S. 23:1225 nowhere provides for a reduction of benefits paid under the provisions of the worker's compensation statute for such retirement benefits. See, McKenzie v. City of Bossier City, 585 So.2d 1229 (La.App. 2d Cir.1991). Therefore, we amend the judgment to delete that portion of the judgment allowing for an unspecified and unproven credit or offset. Should Traweek begin receiving a benefit covered under La. R.S. 23:1225 which would entitle the employer to a credit or offset, the City is not precluded in the future from judicially demanding and proving its entitlement to such credit or offset. See, Holmes v. International Paper Co., 559 So.2d 970 (La.App. 2d Cir.1990).

Did the OWC abuse its discretion in denying penalties and attorney's fees?
The plaintiff's answer next argues that the OWC erred in failing to award him penalties and attorney's fees. The employer or insurer must pay benefits for temporary total disability within 14 days of notice of the injury and medical benefits within 60 days after receiving written notice. La. R.S. 23:1201. The failure to pay timely subjects the defendant to penalties and reasonable attorney's fees unless "the claim is reasonably controverted or if such nonpayment results from conditions over which the employer or insurer had no control." La. R.S. 23:1201 F(2). To reasonably controvert a claim, the employer or insurer must have *664 factual or medical information of such a nature that it reasonably counters that provided by the claimant. Davis v. Jones Baldwin Music Co., 27,545 (La.App.2d Cir. 11/01/95), 662 So.2d 803.
The OWC has great discretion in deciding whether to allow or disallow penalties and attorney's fees, and the decision will not be disturbed absent abuse of that discretion. Balsamo v. Jones, 28,885 (La.App.2d Cir. 12/11/96), 685 So.2d 1140. Given the facts of this case, we find no abuse of discretion in the OWC's ruling that this dispute presented a "`close' question of whether the particular events met either medical or legal definitions of injury and disability." The facts and law regarding mental injury were reasonably controverted by defendant.

Conclusion
Accordingly, for these reasons, we amend the judgment to specify that the defendant has not proven its entitlement to any credit or offset and in all other respects, the decision of the OWC is affirmed at defendant's costs.
AMENDED IN PART AND AFFIRMED AS AMENDED.
BROWN, J., dissents in part.
BROWN, Judge, dissenting in part.
Traweek failed to prove by clear and convincing evidence that his mental disability resulted from the controlled training exercise. His mental disability existed prior to the training and resulted from work-related stress that occurred over a period of time. Our legislature has deemed such not compensable.
I agree with the majority opinion that defendant has not proven entitlement to any credit or offset.

APPLICATION FOR REHEARING
Before MARVIN, C.J., and BROWN, WILLIAMS, CARAWAY and PEATROSS, JJ.
Rehearing denied.
NOTES
[1] The parties stipulated to the amounts of Traweek's earnings and the weekly compensation which would be due if the court found him entitled to benefits. While not receiving worker's compensation benefits, until April 13, 1996, Traweek was considered to be on sick leave and was paid his regular salary.