# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 07-1403


**ALYCE MOUTON**

**VERSUS**

**WALGREEN COMPANY**


**\*\*\*\*\*\*\*\*\*\***

APPEAL FROM THE
OFFICE OF WORKERS' COMPENSATION - # 4
PARISH OF LAFAYETTE, NO. 04-04416
SAM L. LOWERY, WORKERS' COMPENSATION JUDGE

**\*\*\*\*\*\*\*\*\*\***

## MARC T. AMY
## JUDGE

**\*\*\*\*\*\*\*\*\*\***

Court composed of Sylvia R. Cooks, Marc T. Amy, and J. David Painter, Judges.

**AFFIRMED AS AMENDED.**

**Michael B. Miller**
**Post Office Drawer 1630**
**Crowley, LA 70527-1630**
**(337) 785-9500**
**COUNSEL FOR PLAINTIFF/APPELLEE:**
     **Alyce Mouton**

**Daren Sarphie**
**Guillory, Scott & Associates**
**3045 Ridgelake Drive, Suite 201**
**Metairie, LA 70002**
**(504) 838-8811**
**COUNSEL FOR DEFENDANT/APPELLANT:**
     **Walgreen Company**

AMY, Judge.

The claimant alleges that she suffered injury to her neck and back as a result of two separate work-related accidents. The employer denied the claimant's request for workers' compensation and medical benefits, arguing that her injuries were caused by a previous motor vehicle accident. The claimant filed a disputed claim form, seeking indemnity and medical benefits, penalties, attorney fees, and legal interest. Following a hearing, the workers' compensation judge found in the claimant's favor. The employer appeals. For the following reasons, we affirm as amended.

## Factual and Procedural Background

The record indicates that on May 22, 2000, the claimant, Alyce Mouton (Mouton) was hired by the defendant, Walgreen Company (Walgreens),[1] as an assistant manager. Mouton testified that over the years, she worked at various Walgreens stores in southwest Louisiana. In February 2004, she began working at a Walgreens located in Lafayette, Louisiana. Mouton alleged that near the end of her shift on March 29, 2004, she was moving a bale of boxes when she felt discomfort in her neck and back. Because she was off for the next few days, Mouton "took it easy" and did not seek any medical attention.

Mouton stated that within four or five days of moving the bale (April 5, 2004), she returned to work. According to Mouton, she was moving merchandise to the front of the shelf when she felt extreme pain in her lower back. After seeking treatment at the local emergency room, Mouton visited her doctor who took her off of work.

---

[1] We note that in its answer and all subsequent pleadings, Walgreens identifies itself as "Walgreens Drug Stores."

On June 21, 2004, Mouton filed a disputed claim for compensation form in which she alleged that no wage benefits had been paid and that no medical treatment had been authorized. She requested penalties, attorney fees, and judicial interest. After filing an answer, Walgreens filed a motion for summary judgment, arguing that Mouton violated La.R.S. 23:1208 by making false and misleading statements, "or, alternatively, that defendant is entitled to a credit pursuant to La.R.S. 23:1102 for compensation paid by third parties for injuries allegedly sustained while in the course and scope of employment with defendant." In response, Mouton filed a motion for summary judgment requesting that Walgreens' allegations be dismissed. The workers' compensation judge denied both motions.

Following a March 27, 2007 hearing on the merits, the workers' compensation judge found that "Mouton was injured in the course and scope of her employment with Walgreens Drug Stores on March 29, 2004 and April 5, 2004." It ordered Walgreens to "pay temporary total disability benefits to Alyce Mouton in the amount of $429.00 per week beginning April 6, 2004 and that Walgreens pay all reasonable and necessary medical treatment resulting from the accident." Walgreens was assessed with a $4,000.00 penalty for the failure to pay Mouton's medical benefits and mileage expenses and a 12% penalty "on weekly compensation benefits due and unpaid, as well as attorney's fees in the amount of $18,500.00 and court cost[s] in the amount of $740.43."

Walgreens appeals, designating the following as error:

1.  [T]he trial court committed manifest error in finding that claimant-appellant satisfied her burden of proof to show that the alleged employment-related accidents exacerbated her pre-existing neck and back injuries to create a disability by improperly applying the legal presumption of causation.

2.  Alternatively, the trial court committed manifest error in finding that claimant-appellee's neck was part of a compensable injury.

2

3.    [T]he trial court committed manifest error in assessing penalties and attorney fees against defendant-appellant for failing to pay benefits when the totality of the evidence showed that defendant-appellant reasonably controvert the claim for benefits based on medical and other evidence obtained.

4.    Alternatively, the trial court committed manifest error in awarding penalties in excess of the statutory cap set out under La.R.S. 23:1201F.

5.    [T]he trial court committed manifest error in failing to give defendant-appellant a credit against indemnity benefits due for the short-term disability benefits claimant-appellee received during the period of April 14, 2004 through June 21, 2004.

**Discussion**

*Pre-Existing Injuries and Disability*

Walgreens argues that "[t]he legal presumption of causation does not apply when the injured employee already suffers from the disabling symptoms at the time of the work accident." It alleges that Mouton failed to produce any evidence, other than her testimony, that the alleged accidents aggravated her pre-existing neck and back pain and created her disability. According to Walgreens, "[t]he statements or lack thereof, made in the medical reports following each alleged work accident are so inconsistent with [Mouton's] testimony regarding her injuries from each [accident] that the trial court could not have reasonably found in her favor." Walgreens references the findings and conclusions of the physicians who examined Mouton for a second medical opinion and an independent medical examination.

In oral reasons for ruling, the workers' compensation judge explained:

From the evidence, both live and documented, there appears to be little doubt that at the time Ms. Mouton says she was injured at Walgreens, she was still being treated for injuries she received in a previous automobile accident. This is about the only thing upon which both parties seem to agree. Her counsel argues that the two injuries at the store combined to complicate and exacerbate the automobile injury, while Walgreens steadfastly takes the position that Ms. Mouton is fabricating out of thin air a purely fictitious and fraudulent tale of work accidents in order to cash in even more on her automobile wreck.

3

. . . .

The Court finds that the medical evidence and the credible testimony shows that Ms. Mouton carried her burden of proof in her assertion that she was injured while in the course and scope of her employment with Walgreens on March 29th and April 5, 2004; and as a result is entitled to Temporary Total Disability benefits in the amount of Four Hundred Twenty-nine Dollars per week beginning April 6, 2004, as well as all prior medical and mileage expenses. She should receive all reasonable and necessary medical treatment.

Mouton testified that on January 31, 2004, she was in a motor vehicle accident. She stated that she sought treatment at the Jennings American Legion Hospital (Jennings Hospital) emergency room for injuries to her neck and back. Upon her discharge, Mouton was prescribed pain medication and was told to follow up with her doctor. Mouton stated that when she saw Dr. R. Dale Bernauer, an orthopedic surgeon, on February 25, 2004, she reported that she was in a motor vehicle accident and that she had "lower back pain and neck pain and headaches." Dr. Bernauer ordered an MRI of Mouton's cervical and lumbar spine and placed her on physical therapy. Mouton was able to return to work without any limitations.

Mouton began attending physical therapy on March 2, 2004. She maintained that the physical therapy was beneficial in that "I was doing a lot better until . . . I moved that bale, then something in my lower back just didn't feel the same after that." Mouton testified that on March 29, 2004, she was trying to maneuver a bale of boxes[2] when "I felt something in my neck and in my lower back." She recalled what happened next:

_____

[2] Mouton explained:

[W]e get a lot of, you know, merchandise in, and it comes in really large boxes. So what they do is they throw it in . . . the compactor in the back of the stockroom, and . . . the compactor smashes it. And so they take it out, they tie it up in a big bale, and they lay it on the floor. They're supposed to lay it on one of those little bitty rolling devices. Well, they put it on the floor. Well, they left it there and told me to move it outside by the other bales. And it's a -- it's a fairly large bale of boxes. . . .

4

And I remember I kind of, you know, just like, "ow," something, you know, felt uncomfortable. And so I just left the stockroom, went in the back, and I remember I told Miss Joanne -- she asked me what was wrong, and I said I kind of -- I don't know. I said something just feels uncomfortable. Something happened, you know, with my lower back, and I felt a pull in my neck.

Mouton testified that her accident happened around 4:30 or 5:00 in the morning and that she finished working her shift which ended between 6:00 or 7:00 a.m. She further testified that "when my relief came in, which was Ms. Duplantis at the time, I had told [her] . . . that I kind of hurt my back a little bit and then I went home."

Mouton explained that "the way my schedule worked, I worked four nights on and four nights off. So what I had done was, I just kind of took it easy for the next few days. I didn't do a whole lot."[3] She testified that when she returned to work, she had another accident. Mouton described what occurred on the morning of April 5, 2004:

I was going to straighten down the last aisle, and I happened to be reaching. And whenever I was reaching to front the merchandise on the top shelf, I felt like an . . . electrical shock in the . . . middle to the low part of my back, and it shot down my left leg. And I remember it -- it really hurt bad 'cause it kind of . . . almost made me fall.

And I turned around and Ms. Joanne was looking at me, and she's like, Ms. Mouton, are you okay? And I said I just, you know, hurt myself. I hurt my back. And -- and that's when tears were going down my face. And then at that time, probably about an hour or so later Ms. Duplantis came in, and I told her I had to go home. I had to go, you know, to the emergency room, and that's pretty much what I done.

According to Mouton, she went to the Jennings Hospital emergency room on April 6, 2004 and relayed to the attending physician that "I was reaching for something, and I felt something in my back." The emergency room physician prescribed her medication, took her off of work, and advised her to follow up with her orthopedic surgeon. She asserted that when she saw Dr. Bernauer at her next

_____

[3] Upon further questioning, Mouton admitted that she did not remember if she was scheduled to come in the next night or if that was the beginning of her four days off.

regularly scheduled appointment, she informed him of the bale accident. However, she does not recall mentioning the second accident in which she was fronting merchandise. Mouton stated that Dr. Bernauer took her off of work. She has not worked in any capacity since April 5, 2004.

After reviewing the record, we find that it supports the workers' compensation judge's determination that Mouton was injured in the course and scope of her employment on March 29, 2004 and April 5, 2004. It is undisputed that Mouton's neck and back were injured in the January 31, 2004 motor vehicle accident. However, she testified that her physical therapy sessions were helping and that she was feeling better until she moved the bale of boxes. Although there were no witnesses to the work accident, Mouton testified that she immediately told Jo Ann[4] Pomier (Pomier), the clerk working that night, that something had happened with her lower back and that she felt a pull in her neck. According to her deposition, Pomier testified that after Mouton had returned from putting out the trash and the bale, Mouton told her that she was hurting badly. Mouton stated that the pain was "going down her neck, it burned."

Pomier testified that she witnessed Mouton's accident that occurred while she was fronting merchandise. She explained that, "[a]t that time I think I was on the chip aisle, which is directly where she was on - it was Aisle 9. And she was . . . reaching and pulling, and all I saw was her do this.[5] I asked if she was okay, and she was just crying." Pomier insisted that Mouton was injured on "two separate occasions. I don't know that it was two separate days, though. I remember her straightening; and she told me something hurting. . . . I don't know which one came first."

---

[4] In her deposition, Pomier states that her first name is spelled "Jo Ann", not "Joanne."

[5] Pomier stated that Mouton "grabbed her neck area[.]"

Walgreens contends that Mouton's medical records, particularly those of Jennings Hospital, Dr. Bernauer, and NovaCare Rehabilitation (NovaCare), do not support her contention that the alleged work-related accidents aggravated her preexisting injuries.

We note that the Jennings Hospital record dated April 6, 2004 states: "To ER [with complaints of low] back pain [for] 2 months since MVA on Jan. 31, 04. States worse last couple of weeks then last night @ work was reaching for something high and felt a severe pain in back radiating [down] lt leg."

When Mouton visited Dr. Bernauer on February 25, 2004, she stated that she was in a motor vehicle accident on January 31, 2004. He noted that "[s]he complains of lower back pain and neck pain and headaches. She has left arm pain and numbness to her left little finger. She has no radiation of pain to her legs." Dr. Bernauer diagnosed her with a cervical and lumbar strain, ordered MRIs, prescribed her medications, and recommended physical therapy.

Dr. Bernauer testified that when he saw Mouton on April 14, 2004, she relayed to him that her physical therapy sessions were helping. He noted that "[s]he'd gone back to work. She said that she was moving a bale of something at work and her back got worse after this, and she was complaining of low back pain with left leg pain radiating down to her little toe. Said her neck was doing fairly well." Dr. Bernauer testified that the MRI on Mouton's lumbar spine showed a bulging disc at the L5-S1 level, and the MRI on her cervical spine revealed a herniation at the C5-C6 level. According to Dr. Bernauer, Mouton did not tell him of any other work-related accidents.

In response to a questionnaire sent from Broadspire Services, Inc. (Broadspire), the third party administrator for Walgreens' workers' compensation claims, Dr.

7

Bernauer opined that as of May 7, 2004, Mouton was temporarily disabled and that the she could not return to work. He stated that her condition was caused by the January 31, 2004 motor vehicle accident.

Dr. Bernauer noted that when he saw Mouton on June 23, 2004, she informed him that she was in a motor vehicle accident on June 3, 2004 which aggravated her neck. Dr. Bernauer testified that at the time of this visit, he was attributing Mouton's back pain "to the original accident and this injury at work in which she … had moved this bale [which] had increased her back pain." However, he only attributed the increased neck pain to the June 3, 2004 accident. Dr. Bernauer affirmed that his opinions were based on the history given to him by Mouton.

Dr. Bernauer testified that during subsequent visits, Mouton still complained of neck and back pain, although her neck pain seemed to be improving. He stated that during her April 25, 2005 visit, he gave her a light-duty work release. However, when she returned on May 23, 2005, Mouton contended that she was in too much pain to return to work. In a May 25, 2005 letter, Dr. Bernauer once again opined that Mouton's back injury was worsened by the bale accident. He testified that when he saw Mouton on March 15, 2006, she was "only complaining of back pain and leg pain" as "her neck pain has pretty much gone away[.]"

With regard to her treatment at NovaCare, Mouton testified that she did not recall exactly what she told her physical therapist about the bale accident, but she remembered "telling him something about something had happened at work." The NovaCare record dated March 29, 2004, the date of the bale accident, states that "[patient advances] trend toward feeling better continues. Exercises hurt her too much so none were continued today." In a section entitled "Assessment: Tolerance to Treatment," there is a notation that states "pt. cont. to have . . . symptoms of

8

neck/back pain." Mouton stated that while her "neck was feeling better[,]" her lower back was causing her so much pain that she could not endure any treatment to that area.

At her next visit on March 31, 2004, Mouton continued to complain of "intense pain especially in the [low back] area today. Bother her @ work when standing for long periods." The physical therapist noted that Mouton "cont. to have difficulty getting over her pain symptoms." When questioned as to why she did not explain that her aggravating symptoms at work were caused by moving a bale, Mouton answered:

> I never denied the fact that I hurted [sic]. I did hurt, even whenever I got into the wreck. It's just the pain was different whenever I hurt my back at work. It's something totally different. It was a different type of pain. That's why they stopped doing the treatment at the lower part of my back. And if you read in the reports of physical therapy it states at the bottom I was doing better until the last few weeks. They discontinued the treatments because of my injury at work. It does say that in there.

Although the record for April 1, 2004 notes a decrease in Mouton's symptoms, Mouton again maintained that only her neck was getting better. The NovaCare record dated April 7, 2007 indicates that Mouton "had to go to the ER last night. Think it's b/c of work. 2 nights ago reached over head & got a shock in back that went to back of l[eft] leg. . . . 2 weeks ago (about when began work) back [pain] became constant." Moreover, in a April 12, 2004 report to Dr. Bernauer regarding Mouton's continued need for physical therapy, the physical therapist noted, "[s]he had improved when she returned to work. After [] 3 weeks at work, her symptoms increased significantly and left lower extremity symptoms began. We have been working on decreasing the inflammation and reducing the radiating symptoms."

Because of Dr. Bernauer's opinion that the bale accident aggravated Mouton's injuries, Mouton was examined by Dr. Douglas Bernard, Walgreens' choice of orthopedic surgeon, on November 11, 2005 for a second medical opinion. Dr.

9

Bernard testified that Mouton told him that while at work in March or April of 2004, "she felt [an] uncomfortable feeling in neck and lower back." Dr. Bernard stated that Mouton also told him that she had a "shocking sensation" when she was reaching on top of a shelf. Additionally, she informed him of her January 31, 2004 accident. Dr. Bernard further stated:

> She told me or led me to believe that the automobile accident was pretty much a nothing thing. . . . In any event, it became obvious during the interview that . . . she didn't really have an injury at [Walgreens]. She told me she was just doing some things and noticed something. She didn't fall. She didn't get hit or anything like that, and she played down significantly her . . . current treatment with Dr. Bernauer and tried to indicate that everything was because of the [Walgreens] incident, when in actuality there was no incident.

Dr. Bernard stated that Mouton had a normal physical exam, no objective findings of injury, and "feigned" subjective complaints. He opined that she was not in need of further medical treatment.

Dr. Bernard maintained that he would not alter his opinion even if he misunderstood the history given to him by Mouton. However, he admitted that reaching up on a shelf could have aggravated Mouton's preexisting condition.

Walgreens also references an independent medical examination conducted by Dr. M. Angela Mayeaux, an orthopedic surgeon, on February 14, 2007. Dr. Mayeaux noted that Mouton had full range of motion of her neck and that she was tender at the L4-L5 and L5-S1 level of her back. In her report, Dr. Mayeaux stated that she did not have any documentation, besides the records of Dr. Bernauer, that Mouton's back and neck pain had improved prior to her alleged work-related accident. Dr. Mayeaux opined that if Mouton's "work accident is as she described she could have had exacerbation of her pre-existing cervical arthritis." Dr. Mayeaux disagreed with Dr. Bernauer's recommendation of a discogram and decompressive therapy and concluded that Mouton could perform light duty work.

10

In *Smith v. Town of Olla*, 07-384, p. 13 (La.App. 3 Cir. 10/3/07), 966 So.2d 1165, 1174, this court stated that, "[i]t is within the province of the workers' compensation judge to assess the credibility of the physicians who examined and/or treated [the claimant]." Furthermore, in *Freeland v. Bourgeois*, 06-932, p. 31 (La.App. 3 Cir. 1/24/07), 950 So.2d 100, 119-20, *writ denied*, 07-409 (La. 4/5/07), 954 So.2d 144, we explained:

> [I]n general, the observations and opinions of the treating physician are to be accorded greater weight than those of a physician who has only seen the party for purposes of rendering an expert opinion concerning the party's condition. "However, the treating physician's testimony is not irrebuttable, as the trier of fact is required to weigh the testimony of all of the medical witnesses." *Freeman v. Rew*, 557 So.2d 748, 751 (La.App. 2nd Cir.1990) (citations omitted), *writ denied*, 563 So.2d 1154 (La.6/01/90). Ultimately, "the weight afforded a treating physician's testimony is largely dependent upon the physician's qualifications and the facts upon which his opinion is based." *Id*.

The record shows that Mouton met with Drs. Bernard and Mayeaux on one occasion each. However, she has been treating with Dr. Bernauer since February 25, 2004. Dr. Bernauer had the opportunity to examine Mouton within a month of her motor vehicle accident and has seen how her neck and back pain has progressed after her work-related accidents. Given his frequent visits with Mouton, we find that the workers' compensation judge could have accorded greater weight to the observations, findings, and conclusions of Dr. Bernauer than those of Drs. Bernard and Mayeaux.

In *Wyble v. Acadiana Preparatory School*, 07-91, p. 6 (La.App. 3 Cir. 5/2/07), 956 So.2d 722, 726, *writ denied*, 07-1178 (La. 9/14/07), 963 So.2d 1004, this court explained that "[a] preexisting medical condition will not bar an employee from recovery if the employee establishes that the work-related accident aggravated, accelerated, or combined with the condition to cause the disability for which compensation is claimed." "Aggravation of a preexisting injury may constitute a disabling injury when, for example, the plaintiff begins to suffer new symptoms after

11

the second workplace accident." *Tate v. Cabot Corp.*, 01-1652, p. 6 (La.App. 3 Cir. 7/3/02), 824 So.2d 456, 461, *writ denied*, 02-2150 (La. 11/22/02), 829 So.2d 1044. Whether a causal relationship exists between the disability and the employment is a question of fact that will not be reversed on appeal absent manifest error. *Id.*

Based on the evidence and testimony, we find no manifest error in the workers' compensation judge's determination that Mouton's two work-related accidents aggravated her preexisting injuries and rendered her disabled. Although Mouton claimed that she was feeling better after attending physical therapy for her January 31, 2004 accident, she was not completely healed from her preexisting injuries. However, Mouton stated that she was able to return to work in February 2004.[6] After moving the bale and fronting merchandise, Mouton reported, and Dr. Bernauer corroborated, an increase in the severity and degree of back pain. In fact, Mouton stated that "it was a different kind of pain" than what she was previously experiencing. Furthermore, according to the records of Dr. Bernauer and NovaCare, Mouton's complaints of lower extremity pain only began *after* her work-related accidents.

We find no merit in Walgreens' argument that because Dr. Bernauer related Mouton's neck pain to her two motor vehicle accidents, her neck was not part of a compensable injury. We note that Mouton stated that she felt a pull in her neck after moving the bale. However, it appears from the records of Dr. Bernauer and NovaCare, as well as Mouton's testimony, that although her neck bothered her, it was not her chief complaint.

For the reasons set forth above, this assignment is without merit.

---

[6] According to Monica Duplantis Russo, Walgreens' executive assistant manager, Mouton resumed working for Walgreens on March 20, 2004.

*Penalties and Attorney Fees*

Walgreens argues that the workers' compensation judge erred in awarding penalties and attorney fees as it reasonably controverted Mouton's claim for benefits. It notes that Dr. Bernauer originally stated that Mouton's condition was caused by her January 31, 2004 motor vehicle accident and that it was not until May 25, 2005 that he opined that her pre-existing back pain was aggravated by the bale accident. Alternatively, Walgreens contends that if penalties are appropriate, the workers' compensation judge "erred in assessing penalties that exceed the statutory cap set out under La.R.S. 23:1201F."

Louisiana Revised Statutes 23:1201(E) states that "[m]edical benefits ... shall be paid within sixty days after the employer or insurer receives written notice thereof." *See also Frederick v. Port Aggregates, Inc.*, 07-552 (La.App. 3 Cir. 10/31/07), 968 So.2d 1169. Louisiana Revised Statutes 23:1201(F) provides in relevant part:

> Failure to provide payment in accordance with this Section or failure to consent to the employee's request to select a treating physician or change physicians . . . shall result in the assessment of a penalty in an amount up to the greater of twelve percent of any unpaid compensation or medical benefits, or fifty dollars per calendar day for each day in which any and all compensation or medical benefits remain unpaid or such consent is withheld, together with reasonable attorney fees for each disputed claim; however, the fifty dollars per calendar day penalty shall not exceed a maximum of two thousand dollars in the aggregate for any claim. The maximum amount of penalties which may be imposed at a hearing on the merits of the number of penalties which might be imposed under this Section is eight thousand dollars. An award of penalties and attorney fees at any hearing on the merits shall be res judicata as to any and all claims for which penalties may be imposed under this Section which precedes the date of the hearing.
>
> . . . .
>
> (2) This Subsection shall not apply if the claim is reasonably controverted or if such nonpayment results from conditions over which the employer or insurer had no control.

To avoid the imposition of penalties and attorney fees, the employer must present sufficient factual and medical information to reasonably counter the evidence provided by the claimant. *Humphrey v. Icee Distributors*, 06-549 (La.App. 3 Cir. 11/29/06), 944 So.2d 783, *writ denied*, 07-7 (La. 3/9/07), 949 So.2d 442. An award of penalties and attorney fees will not be overturned on appeal absent manifest error. *Frederick*, 968 So.2d 1169.

In reasons for ruling, the workers' compensation judge remarked:

The more closely and longer I listened to the witnesses, the more clear it became that this three-year-old controversy has its roots in an initial misunderstanding by the employer of how the accidents relate to one another. Specifically, Walgreens' investigation led to the conclusion that there was a single accident at the store, and thus Ms. Mouton's explanation which encapsulated two distinct accidents made no sense at all to the investigator. In fact, it made Ms. Mouton look somewhere between foolish and plain dishonest.

Walgreens' adjustor testified that she obtained a statement from both the store manager and a second manager; however, testimony was neither of these individuals were anywhere near the store on the day of either accident. And the deposition given by the second store manager showed clearly that she had no idea that there were two accidents at issue, so she found Ms. Mouton's account of a single accident totally inconsistent. As well she would.

Ironically and inexplicably, the one person who was in the store at the time of both accidents and who testified that she witnessed them, was never asked to give a statement or questioned by the defendant.

It appears that once the defendant made and then thoroughly bought into the erroneous conclusion that Ms. Mouton's seeming inconsistency was the result of her attempt to defraud and deceive, the investigation seemed to be structured and directed straightway toward building a defense more than toward finding out precisely what happened. Inconsistencies should trigger an intensified, more thorough investigation, not a total shutdown of a claim as a precautionary measure.

Had the investigation stayed open long enough and the defense mind set stayed equally open long enough, it would have been clear that there were indeed two accidents, the first immediately reported and the second witnessed. That's precisely what the evidence showed.

At the hearing, Antoinette Henderson (Henderson), an adjuster with Broadspire, stated that she was assigned to handle Mouton's claim on April 27, 2004, the same day that it was reported to Broadspire. On that date, Henderson contacted Danny Fontenot (Fontenot), Walgreens' store manager, but was not able to speak with him. She spoke with Monica Duplantis Russo (Russo), the executive assistant manager, on April 28, 2004.

In her statement, Russo recalled that on April 6, 2004, Mouton told her that she was going to the emergency room because "the night before she felt a shooting pain which all of a sudden came over her." After seeking medical treatment, Mouton brought in a disability slip from her doctor. Russo stated that when she talked to Mouton on April 19, 2004, Mouton "advised her that she had three bulging discs in her back and requested that they complete a workers' comp report" because she was injured while moving a bale. According to Russo, this was the first time that Mouton alleged a work-related accident. Russo stated that Pomier heard Mouton say "ouch while she was out working or walking on the floor[,]" but that Pomier "had no knowledge of what task the claimant had been performing."

Henderson testified that she took a recorded statement from Mouton on the same day. Mouton informed her that she had been in a motor vehicle accident, that Dr. Bernauer was treating her, and that she was attending physical therapy. Furthermore, Mouton asserted that she had two work-related accidents. On April 29, 2004, Henderson received the medical records from Jennings Hospital which indicated that Mouton experienced back pain when reaching for something high at work.

Henderson testified that she received a May 7, 2004 report from Dr. Bernauer's office in which he stated that Mouton's condition was caused by a motor vehicle

15

accident. In a note dated May 12, 2004, Henderson wrote: "Involving a second medical opinion is a risk but we can do it as a precautionary measure. . . . At this point the medical is in our favor and we have the assist[ant] man[a]ger's statement. I'm planning to just send her a written denial." Henderson acknowledged that she did not do anything to further investigate the claim. Rather, she explained that Mouton's claim was denied because of "[c]ompensability issues, too many accidents at one time, the motor vehicle accident and Bernauer's report."

Henderson received a report from Dr. Bernauer dated June 23, 2004 in which he stated that during her April 14, 2004 visit, Mouton told him that she was injured at work while moving a bale. The findings of Mouton's MRI was attached to this report. Henderson testified that she did not request any clarification from Dr. Bernauer because she was engaged in settlement negotiations with Mouton's previous attorney. She alleged that she did not know what happened to Mouton's claim once she stopped handling it in September 2004.

After reviewing the record, we find that it supports a determination that Walgreens did not reasonably controvert Mouton's claim. Henderson testified that Russo thought that there was only one accident but two different versions. Furthermore, Henderson stated that although she knew that there was a pharmacist and a clerk working on the nights of the accidents, she did not get a statement from either of them because of what Mouton and Russo had told her. Mouton stated that the pharmacist did not hear her and that the cashier was at the front of the store.

Henderson's notes show that Mouton "complain[ed] to the cashier about her back hurting and she was holding her lower back but also stated that she hurt her neck also." In her notes for April 28, 2004, Henderson told Russo that she would get in contact with Pomier. The following day, Henderson also stated that she would get

16

the recorded statement of Pomier. However, the record shows that no one on behalf of Walgreens ever contacted Pomier to ascertain what she knew about Mouton's work-related accidents.[7]

"The employer has a continuing duty to investigate, assemble, and assess factual information before it denies benefits." *Mitchell v. Alliance Compressors*, 05-1186, p. 8 (La.App. 3 Cir. 4/5/06), 926 So.2d 127, 133. Within a few days of receiving Dr. Bernauer's May 7, 2004 report, Henderson wrote that getting a second medical opinion was a risk and that given Russo's statement and the medicals in their favor, Broadspire was going to deny the claim. Walgreens did not attempt to schedule a second medical opinion until September 2005 based on Dr. Bernauer's opinion in a May 25, 2005 report that Mouton's back pain was aggravated by the bale accident. Given the evidence, we conclude that the imposition of penalties and attorney fees was not manifestly erroneous.

Our attention now turns to whether the workers' compensation judge violated the penalty cap set forth in La.R.S. 23:1201(F). Louisiana Revised Statutes 23:1201(F) provides that "*[t]he maximum amount of penalties* which may be imposed at a hearing on the merits regardless of the number of penalties which might be imposed under this Section *is eight thousand dollars*." (Emphasis added).

Here, the workers' compensation judge imposed a $4,000.00 penalty for Walgreens' failure to pay medical and mileage benefits and a twelve percent penalty on all weekly compensation benefits due effective April 6, 2004. Because these combined penalties exceed the maximum amount allowed under the statute, we amend the total penalty award to $8,000.00. *See Lambert v. Brookshire Grocery Co.*, 06-1001 (La.App. 3 Cir. 12/20/06), 945 So.2d 918.

---

[7] Pomier was not deposed until January 5, 2006, almost three years after Mouton's first work-related accident.

*Credit for Short-term Disability Benefits*

Walgreens argues that if "this Court finds that claimant-appellee is entitled to workers' compensation benefits, then the trial court erred in not finding that defendant-[appellant] was entitled to a credit against any back indemnity due for payments claimant-appellee received through the defendant-appellant's short-term disability."

Louisiana Revised Statutes 23:1225 provides in pertinent part:

C. (1) If an employee receives remuneration from:

(a) Benefits under the Louisiana Workers' Compensation Law.

. . . .

(c) Benefits under disability benefit plans in the proportion funded by an employer.

(d) Any other workers' compensation benefits,

then compensation benefits under this Chapter shall be reduced, unless there is an agreement to the contrary between the employee and the employer liable for payment of the workers' compensation benefit, so that the aggregate remuneration from Subparagraphs (a) through (d) of this Paragraph shall not exceed sixty-six and two-thirds percent of his average weekly wage.

Louisiana Revised Statutes 23:1225(C)(1) "is a restriction on an injured employee's right to workers' compensation benefits and must be strictly construed. An employer seeking credit for benefits covered by the statute has the burden of proving both entitlement to and the amount of the credit." *Jones v. General Motors Corp.*, 03-1766, p. 12 (La. 4/30/04), 871 So.2d 1109, 1117 (citations omitted).

After reviewing the record, we find that Walgreens did not carry its burden of proof by establishing the amount of the disability offset. At the hearing, Russo testified that for the period of April 14, 2004 to June 21, 2004, Mouton received $4,602.65 for short-term disability. She stated that that policy was funded entirely

by Walgreens; however, she was "not sure what they paid for it." Given the lack of documentation regarding the amount and date of payments and the details of Walgreens' employer funded disability plan, we find no error in the workers' compensation judge's failure to credit Walgreens for any short-term disability payments made to Mouton. *See Romero v. Northrop-Grumman*, 01-24, p. 9 (La.App. 3 Cir. 5/30/01), 787 So.2d 1149, 1155, *writ denied*, 01-1937 (La. 10/26/01), 799 So.2d 1144 (wherein this court held that the employer was not entitled to a credit for medical and disability benefits where it "did not provide adequate evidence of its entitlement to such benefits at the hearing on the matter.") *See also Traweek v. City of West Monroe*, 30, 571, p. 13 (La.App. 2 Cir. 5/13/98), 713 So.2d 655, 663, *writ denied*, 98-1936 (La. 11/6/98), 727 So.2d 449 (wherein this court "delete[d] that portion of the judgment allowing for an unspecified and unproven credit or offset.")

This assignment has no merit.

## DECREE

For the foregoing reasons, we amend the total penalty award to $8,000.00. In all other respects, the ruling of the workers' compensation judge is affirmed. All costs of these proceedings are assessed against Walgreens Company.

**AFFIRMED AS AMENDED.**

19